[No. 24484-1-I.   Division One.   April 14, 1997.]

THE STATE OF WASHINGTON, *Respondent,* v. DARRIN RAND HUTCHINSON, SR., *Appellant.*

GROSSE, J., dissents by separate opinion.

*Kathryn L. Ross* and *Paul J. Wasson,* for appellant.

*William H. Hawkins, Prosecuting Attorney*; and *Christine O. Gregoire, Attorney General,* and *Gregory P. Canova* and *Todd R. Bowers, Assistants,* for respondent.

WEBSTER, J. — By his own admission, Darrin Hutchinson killed two Island County Deputy Sheriffs in the county jail. He contended at trial that he shot the deputies in self-defense. Nevertheless, the jury convicted him of aggravated first degree murder. Washington's Supreme

Court, in *State v. LeFaber*, recently determined that the self-defense jury instruction given to Hutchinson's jury was erroneous.[1] That instruction did not require the jury to consider whether Hutchinson *reasonably believed* himself to be in imminent danger of great personal injury; it instead allowed the jury to reject self-defense upon finding that he was not in *actual* imminent harm. Because the erroneous instruction has constitutional ramifications, the law presumes that the error prejudiced Hutchinson. We must determine whether the jury could have decided that he reasonably believed himself to be in imminent harm of death or great personal injury, yet convicted him due to the court's legal misstatement. Because Hutchinson introduced factual and expert testimony supporting his reasonable belief, the prosecution has not rebutted the presumed prejudice. Hence, the error was not harmless and we reverse Hutchinson's convictions.

## FACTS

Hutchinson's six-week trial included many witnesses whose testimony we will not discuss. Instead, we relate only the facts needed to understand the assigned errors that we address in this opinion.

Robert Whalen, a retired Seattle police officer, was driving towards the Clinton ferry terminal on November 14, 1987, between 4:00 and 5:00 a.m., when he was passed by an erratically driven, speeding blue Pinto. When arriving at the terminal, Whalen saw the Pinto nearly hit the ferry tollbooth. Whalen told the tollbooth operator he suspected that the Pinto's driver was under the influence of alcohol. The tollbooth operator's co-worker called the police.

Island County Deputy Sheriffs William Heffernan and John Saxerud responded, arresting Darrin Hutchinson for driving while intoxicated. Deputy Saxerud patted Hutchinson down and put him in the patrol car's back seat. Saxerud did not detect a thin, .32 caliber Bersa handgun that

---

[1]*State v. LeFaber*, 128 Wn.2d 896, 913 P.2d 369 (1996).

Hutchinson had inside the waistband of his pants. Deputies Heffernan and Saxerud took Hutchinson to the Island County jail complex to administer a breathalyzer. On the way, Hutchinson mused over the officer's failure to detect his weapon.

At the jail, the officers escorted Hutchinson to the breathalyzer room, removing their service weapons and placing them in a lock box prior to entering. Dispatcher Iverson monitored the procedure on a remote television with sound capacity; he heard no one talking. Five minutes later, around 6:10 a.m., Deputy Saxerud called him on the phone, requesting a driver's license check on Hutchinson. Deputy Saxerud's tone was casual, matter-of-fact. Iverson heard Deputy Heffernan in a loud (but not raised) voice tell Hutchinson not to speak unless spoken to. Noticing that the breathalyzer procedure was proceeding smoothly, Iverson attended to routine duties.

Soon thereafter, Hutchinson pulled out his gun, shot Deputy Saxerud once in the head at close range, and Deputy Heffernan twice from a distance of at least 24 inches. He fished through Deputy Saxerud's pockets for car keys, stole a patrol car, smashed it through the garage door, and raced to his brother's house. Hutchinson later ditched the car down a steep ravine. Island County Sheriff's deputies arrested Hutchinson at his parents' home.

Chief Panzero and Deputy Ridley interrogated Hutchinson for two and a quarter hours soon after his arrest. While Hutchinson admitted killing the deputies, he said that they verbally and physically abused him, including slamming his head into a plexiglas window. But at another point, he acknowledged catching them "totally off guard." When a doctor examined Hutchinson on the morning of the murders, he found only one minor injury, an abrasion and bruising in the thumb area. And Hutchinson attributed that injury to getting his hand stuck while ditching the patrol car.

The State charged Hutchinson with two counts of aggravated first degree murder. The prosecution's theory

was that the deputies were routinely filling out paperwork when Hutchinson, seated on a bench in the room's corner, pulled his gun and shot them. By contrast, the defense contended that Hutchinson shot the deputies while standing, after they slammed him up against the plexiglas window in the door. Because the deputies' and Hutchinson's positioning was highly probative, each side presented expert forensic testimony. One bullet had ricocheted off the breathalyzer room ceiling, and both experts relied upon its trajectory in forming their opinions. Yet they disagreed as to the bullet's angle before it struck the ceiling. And from their respective computations, each expert testified that Hutchinson's location was consistent with their side's case theory.

The jury, after deliberating for two days, convicted Hutchinson on both counts of aggravated first degree murder.

## DISCUSSION
### I.
### SELF-DEFENSE JURY INSTRUCTION

■ Hutchinson contends that the trial court improperly instructed the jury regarding self-defense. The court's instruction allowed the jury to require evidence of imminent danger, rather than a reasonable belief in imminent danger:

> Homicide is justifiable when committed in the lawful defense of the slayer when the slayer reasonably believes that the person slain intends to inflict death or great personal injury and there is imminent danger of such harm being accomplished. [Instr. No. 24.]

Our Supreme Court recently ruled that this instruction is erroneous.[2] It misstates the law because the jury will not necessarily apply the words "reasonably believes" to both of the instruction's subsequent clauses.

---

[2]*State v. LeFaber*, 128 Wn.2d at 902.

■ Because it misstates the law, the instruction is presumed to have prejudiced Hutchinson.[3] This presumption imposes a burden of proof on the State: it must prove beyond a reasonable doubt that the error was trivial or merely academic, and in no way affected the case's final outcome.[4] Put another way, if the jury could have accepted Hutchinson's version of events but found him guilty because of the court's legal misstatement, the error is prejudicial.[5] Here, the jury instruction failed to include *reasonable belief* in the "imminent danger of great personal injury" formulation. Therefore, we focus on evidence demonstrating Hutchinson's reasonable belief in imminent danger of great personal injury or death. Then, we determine whether the jury could have believed that evidence, but still convicted him based on the court's misstatement of the law.

The defense developed factual evidence from which the jury could have inferred that Hutchinson reasonably believed himself to be in imminent danger. When Hutchinson went to his brother's house after the killings, he told him that a deputy had grabbed his wrist, put it behind his back and twisted his arm. And he feared for his life when they slammed his face against a window. He told his brother that one deputy said, "We should just take him out," while the other one said, "We should just kill the little bastard." During his confession, Hutchinson described physical abuse by Deputy Heffernan.

The defense bolstered its theory with testimony from Dr. John Thornton, a forensic science professor. A jury could find Thornton particularly credible because he has

---

[3]*LeFaber*, 128 Wn.2d at 900; *compare Sullivan v. Louisiana*, 508 U.S. 275, 281, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993), *with Pope v. Illinois*, 481 U.S. 497, 502, 107 S. Ct. 1918, 95 L. Ed. 2d 439 (1987); *compare State v. Eastmond*, 129 Wn.2d 497, 503, 919 P.2d 577 (1996), *with State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997).

[4]*State v. Fowler*, 114 Wn.2d 59, 63, 785 P.2d 808 (1990).

[5]*State v. Allen*, 67 Wn. App. 824, 828, 840 P.2d 905 (1992).

special expertise in bullet ricochet, and because he has testified in other cases for both the prosecution and the defense. After examining all written materials relating to physical evidence, Thornton attempted to replicate the shooting conditions. In his opinion, Hutchinson was standing near the door when he fired three shots. Thornton also opined that the prosecution expert's interpretation based on the bullet trajectory was not possible because Hutchinson's seated height was too low for the bullet to ricochet off the ceiling.

The defense also culled supporting evidence from Dr. Howard, a prosecution expert witness. Dr. Howard admitted that the deputies' bodies' positioning and a looping blood pattern was consistent with Deputy Saxerud grabbing Hutchinson's arm while Deputy Heffernan lunged at him. The jury could infer that Hutchinson fired the shots in response to the deputies' approach. Finally, smudges on the breathalyzer window were consistent with facial or forehead skin of a person Hutchinson's height being pressed against the window.

We agree with the dissent that strong evidence supports the prosecution's case theory. But we disagree with the dissent's analysis of Hutchinson's defense. Its analysis blurs the imminence of harm with the requirement that the type of harm be death or great personal injury. Given the evidence and the instructions, this jury could have decided that the deputies attacked Hutchinson, but he was nevertheless not actually in imminent harm of *great personal injury or death*. If so, they could have ignored the issue of *his belief* in that type of harm. In other words, they could have believed Hutchinson's version, but convicted him based on the court's legal misstatement. Given the conflict in the evidence surrounding Hutchinson's belief, the guilty verdict could be attributable to the error. Because the prosecution has not rebutted the presumed prejudice, the error was not harmless.

## II.

## MENTAL HEALTH EXAMINATION

The next assigned error concerns the mental health examination. We will rule on this and one other assigned error to assist the trial court and the parties on retrial.

After being informed that Hutchinson would allege diminished capacity, the prosecution moved the trial court to compel Hutchinson's participation in a mental health examination.[6] When the trial court granted the motion, Hutchinson sought review. The Supreme Court granted discretionary review and affirmed.[7] Nevertheless, Hutchinson refused to participate. The trial court sanctioned him by excluding defense experts relating to diminished capacity.

Because the Supreme Court *affirmed* the trial court's order, it is evident that Hutchinson disobeyed a lawful order by refusing to participate. In this sense, the only issue necessarily before us is the trial court's sanction. Yet the trial court had difficulty applying the Supreme Court decision, and the parties still vehemently disagree as to its meaning. Because this case is being remanded, we will first examine how the trial court applied the Supreme Court decision and then discuss its sanction.

*Constitutional Privilege Against Self Incrimination*

Hutchinson argues that he can refuse to participate in the court-ordered examination by invoking his constitutional right against self-incrimination. We disagree.

The constitution protects a person from being compelled to be a witness against himself in a criminal case.[8] But when a criminal defendant argues that diminished capacity precluded his ability to form the requisite criminal intent, the law presumes that the defendant has

---

[6]CrR 4.7(b)(2)(viii).

[7]*State v. Hutchinson*, 111 Wn.2d 872, 874, 766 P.2d 447 (1989).

[8]U.S. CONST. amend. V; see also WASH. CONST. art. I § 9.

waived the Fifth Amendment privilege against self-incrimination in relation to the capacity issue.[9] Consequently, a criminal defendant who argues diminished capacity cannot refuse to answer incriminating questions during a court-ordered psychiatric examination.[10]

But answering incriminating questions at that exam does not waive the privilege as to guilt or on sentencing issues.[11] Thus, after the defendant answers all questions and submits to all tests, the court will eventually address how to avoid misuse of any incriminating evidence. In other words, precluding its use for purposes other than rebutting the diminished capacity defense. It must guard against using incriminating statements when determining guilt or at sentencing.[12] Based on the actual answers given at the examination, and with reference to other matters properly admitted into evidence (e.g., Hutchinson's confession), the trial court must determine whether to exclude particular answers, and how to limit the jury's use of answers that it admits.[13] The court can meaningfully address these issues only *after* Hutchinson fully participates in the examination.

*Statutory Privilege Against Self-Incrimination*

■ Hutchinson also alleges that he has a statutory privilege against self-incrimination. We find no merit in his argument. The statute upon which he relies addresses

---

[9]*Hutchinson*, 111 Wn.2d 872, 880; *see also Powell v. Texas*, 492 U.S. 680, 684, 109 S. Ct. 3146, 106 L. Ed. 2d 551 (1989); *Granviel v. Lynaugh*, 881 F.2d 185, 190 (5th Cir. 1989); *State v. Bonds*, 98 Wn.2d 1, 20, 653 P.2d 1024 (1982).

[10]*Hutchinson*, 111 Wn.2d 872, 884; *State v. Nuss*, 52 Wn. App. 735, 742, 763 P.2d 1249 (1988).

[11]*Estelle v. Smith*, 451 U.S. 454, 468-69, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981).

[12]*Hutchinson*, 111 Wn.2d 872, 885; *Iowa v. Craney*, 347 N.W.2d 668, 673 (Iowa 1984); *Estelle v. Smith*, 451 U.S. 454 at 468-69.

[13]*See Hutchinson*, 111 Wn.2d 872, 883; ER 401, 402, 403, 105; 5 KARL B. TEGLAND, WASHINGTON UNIFORM PRACTICE: *Evidence* § 24(2) (3d ed. 1989); *State v. Aaron*, 57 Wn. App. 277, 281, 787 P.2d 949 (1990).

insanity and competency.[14] It does not apply to cases involving diminished capacity.[15] Reading RCW 10.77 plainly, and reading *Hutchinson*'s reference to RCW 10.77.020(4) in context, a defendant arguing diminished capacity has *no* statutory privilege against self-incrimination.

In conclusion, the trial court in this case correctly interpreted the Supreme Court decision and correctly compelled Hutchinson to participate in the mental health exam. The power to require an examination is essential because a defendant's "silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case."[16] Although Hutchinson agreed to turn over more of his expert's materials, he never agreed to answer questions about the day he killed the deputies. The trial court correctly held that Hutchinson's continuing refusal to answer questions violated its order.

*Sanction For Refusing To Participate In Examination*

■ As a sanction for Hutchinson's refusal to participate, the trial court excluded the defense expert witnesses regarding diminished capacity (except Dr. Halpern's testimony regarding alcohol's effects). Hutchinson contends that excluding experts was improper under the criminal rules applicable to discovery sanctions. He relies upon cases construing CrR 4.7(h)(7)(i). Yet counsel conceded at oral argument that she never brought CrR 4.7(h)(7), or the cases interpreting it, to the trial court's attention. Nevertheless, because we remand this case, we will address the issue substantively.

The trial court can sanction noncompliance with discovery orders:

the court may order such party to permit the discovery of

---

[14]RCW 10.77.060(1).

[15]*Nuss*, 52 Wn. App. 735, 741. *Compare Hutchinson*, 111 Wn.2d 872, 884 *with State v. Pawlyk*, 115 Wn.2d 457, 467, 800 P.2d 338 (1990).

[16]*Estelle v. Smith*, 451 U.S. 454, 465.

material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances.[17]

The first case interpreting the rule, albeit in a very different context than this case, focused on legislative history.[18] In that regard, the court noted that Washington's rule was adapted from Fed. R. Crim. Proc. 16(g), except that the advisory committee intentionally omitted a clause allowing the court to "prohibit the party from introducing in evidence that material not disclosed."[19] Relying on this legislative history, that case held that CrR 4.7(h)(7)(i) does not allow the trial court to exclude evidence as a sanction. Without exception, the Washington Supreme Court has followed the result reached in that case.[20] Those Supreme Court cases persuade us that the prerule cases upon which the prosecution relies are inapposite.[21]

We think the State's strongest arguments can be summarized as follows. The rule's plain language — that is, the power to "enter such other order as it deems just under the circumstances" — allows the court to exclude witnesses as a sanction in extreme cases. And the Sixth Amendment allows a court to exclude evidence when a defendant raises a mental health issue, but willfully and contumaciously refuses to participate in an independent psychiatric examination.[22] Furthermore, Washington cases

---

[17]CrR 4.7(h)(7)(i).

[18]*State v. Glasper*, 12 Wn. App. 36, 38, 527 P.2d 1127 (1974).

[19]CRIM. RULES TASK FORCE, WASH. JUDICIAL COUNCIL, PROPOSED RULES OF CRIMINAL PROCEDURE, CrR 4.7(h)(7) cmt. at 105 (1971).

[20]*State v. Thacker*, 94 Wn.2d 276, 280, 616 P.2d 655 (1980); *State v. Laureano*, 101 Wn.2d 745, 762, 682 P.2d 889 (1984); *State v. Terrovona*, 105 Wn.2d 632, 651-52, 716 P.2d 295 (1986); and *State v. Ray*, 116 Wn.2d 531, 806 P.2d 1220 (1991).

[21]See *State v. Sickles*, 144 Wash. 236, 257 P. 385 (1927); *State v. Martin*, 165 Wash. 180, 4 P.2d 880 (1931); *State v. White*, 74 Wn.2d 386, 444 P.2d 661 (1968); *State v. Funches*, 5 Wn. App. 491, 487 P.2d 793 (1971).

[22]U.S. CONST. amend. VI; *United States v. Nobles*, 422 U.S. 225, 241, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1995); *Taylor v. Illinois*, 484 U.S. 400, 414-15, 108 S. Ct. 646, 655, 98 L. Ed. 2d 798 (1988); *Michigan v. Lucas*, 500 U.S. 145, 151, 111 S. Ct. 1743, 114 L. Ed. 2d 205 (1991); *United States v. McKneely*, 69 F.3d 1067, 1076 (10th Cir. 1995).

appear to give trial courts the discretion to strike testimony if a witness subsequently invokes the Fifth Amendment on crucial matters.[23]

Nevertheless, a rule that precludes exclusion of evidence as a discovery sanction has an extraordinarily noble rationale. It relies on the jury to winnow chaff from wheat with the benefit of more, rather than less, relevant evidence. Certainly, the discovery rules further this enhanced search for truth by eliminating surprise and making diminished capacity evidence available to both sides.[24] And although the sanction rule preempts evidentiary exclusion, other rules compensate by allowing relatively intrusive discovery.[25] For example, witnesses are required to discuss the case with both sides, or the court can order them deposed.[26] Further, the court can compel discovery of testifying, consulting, and failed experts, including their reports, notes, and test data.[27] Finally, if the State's expert is ill-informed due to a defendant's misconduct, the expert may relate the defendant's refusal to be examined when explaining the bases of the expert's opinion.[28] In sum, Washington's criminal rules unquestionably afford the prosecution sufficient opportunity to rebut a defendant's diminished capacity claim, even if the defendant violates the court's order to participate in a mental health examination. And CrR 4.7(h)(7)(i) unqualifiedly proscribes excluding witnesses as a discovery sanction.

---

[23]*State v. Nelson*, 65 Wn.2d 189, 196, 396 P.2d 540 (1964); *see also Annest v. Annest*, 49 Wn.2d 62, 64, 298 P.2d 483 (1956) (civil).

[24]*Pawlyk*, 115 Wn.2d at 471; *State v. Hamlet*, 83 Wn. App. 350, 356, 921 P.2d 560 (1996), *review granted*, 131 Wn.2d 1005 (1997).

[25]*State v. Gonzalez*, 110 Wn.2d 738, 745, 757 P.2d 925 (1988).

[26]CrR 4.6(a); *See also Glasper*, 12 Wn. App. 36, 39.

[27]*Pawlyk*, 115 Wn.2d 457, 467; *Hamlet*, 83 Wn. App. 350, 358.

[28]*State v. Huson*, 73 Wn.2d 660, 667, 440 P.2d 192 (1968); *Louisiana v. Widenhouse*, 582 So. 2d 1374, 1384 (La. App.), *writ denied*, 586 So. 2d 567 (La. 1991), *cert. denied*, 503 U.S. 910, 112 S. Ct. 1274, 117 L. Ed. 2d 500 (1992).

## III.
## POST-ARREST STATEMENTS TO POLICE

Hutchinson contends that the trial court erred in admitting his confession because it was involuntary under *Miranda v. Arizona*,[29] and because the recording violated the Privacy Act.

*Voluntary Confession Under Miranda v. Arizona*

██ ██ For a statement to be admissible under *Miranda*, the State must establish that the defendant, after being fully advised as to his rights, knowingly and intelligently waived them.[30] When deciding that issue, the trial court considers the defendant's background, experience, and conduct, in short, the totality of circumstances.[31] Nonetheless, our review is narrow because Hutchinson has not assigned error to the court's factual findings.[32] They become verities on appeal, and we decide only whether those findings support the conclusion that the confession was voluntary.[33]

██ ██ Hutchinson argues that inebriation, sleep deprivation, and low intelligence quotient precluded him from knowingly and intelligently waiving his rights. Before addressing these specific impairments, however, we emphasize that in the twelve years preceding the murders, Hutchinson had been "Mirandized" on at least five separate occasions. On each occasion he acknowledged understanding those rights, he waived them, and he answered questions. This substantial experience strongly supports the conclusion that Hutchinson appreciated the warning's gravity and a waiver's concomitant peril.

[29]384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3d 974 (1966).

[30]*State v. Cushing*, 68 Wn. App. 388, 393, 842 P.2d 1035 (1993); *State v. Robtoy*, 98 Wn.2d 30, 35-36, 653 P.2d 284 (1982).

[31]*Robtoy*, 98 Wn.2d at 36.

[32]*Cushing*, 68 Wn. App. 388, 394 n.5.

[33]*State v. Ng*, 110 Wn.2d 32, 37, 750 P.2d 632 (1988); *Cushing*, 68 Wn. App. 388, 393.

Still, Hutchinson had a .14 blood alcohol test when he received the *Miranda* warnings the morning of the murders. But his own expert, after reviewing the taped interview's first 10 minutes, did not conclude that Hutchinson's speech reflected inebriation. And Hutchinson, an alcoholic, was experienced in consuming alcohol while continuing to function. In this regard, one deputy who arrested him — and who had known him for several years — observed no difficulty in his walking or talking, and did not feel that Hutchinson was under the influence. Similarly, he was responsive both during the ride to jail and during the interrogation.

Regarding sleep deprivation, he had not slept for twenty-two hours before the interrogation. Yet his responsiveness and his ability to walk and talk belie his alleged inability to knowingly and voluntarily waive his rights. Moreover, his expert gave only the generalized opinion that sleep deprivation would have a negative impact on IQ and would detrimentally affect cognitive functioning. The trial court, weighing all circumstances, correctly relied on definite eyewitnesses, rather than on uncertain, unquantified theoretical conjecture.

Similar weaknesses diluted Hutchinson's argument that his IQ (79) impaired his ability to voluntarily waive his rights. His expert testified that Hutchinson would have difficulty understanding the rights and would not understand the consequences of waiver. But at the time she evaluated him, the expert did not know Hutchinson's past experience with *Miranda*. Furthermore, when she interviewed him, she never discussed whether he understood *Miranda* or what would happen if he waived those rights. Aside from this discredited expert testimony, the trial court could justifiably be persuaded by what actually happened: nine hours after the initial interrogation concluded, when the second interrogation started, Hutchinson asserted his right to counsel. To summarize, the findings support the trial court's conclusion that Hutchinson's inebriation, drowsiness, and low IQ did not preclude him from knowingly and intelligently waiving *Miranda*.

Hutchinson also contends that he asserted his right to remain silent during the interrogation. The trial court, however, found that he indicated a willingness to talk. The only contrary evidence was Hutchinson's statement, at one point during the interrogation, that he wanted the tape recorder turned off. But he stated that he would continue talking to the deputies with the recorder off.[34]

*Privacy Act*

Hutchinson contends that the deputies who recorded his confession violated the Privacy Act, making the recording inadmissible. During the interrogation, the deputies turned the recorder off at Hutchinson's request, and did not indicate the time when they turned it back on.[35]

The Privacy Act requires police officers to include the beginning and ending time in recorded conversations with arrestees.[36] That requirement helps avoid oppressively long interrogations and interrogations at unreasonable times.[37] Since *State v. Rupe*,[38] however, courts excuse a technical violation when the police substantially comply with the requirement and their procedures safeguard the defendant from abuse.[39] In this case, the recording includes numerous starting and stopping times. These substantially complying procedures safeguarded Hutchinson, and the recorded confession did not violate the Privacy Act.

Because the deputies substantially complied with the Privacy Act, and Hutchinson knowingly and voluntarily waived his *Miranda* rights, the trial court properly admitted his confession.

---

[34]*Cf. State v. Grieb*, 52 Wn. App. 573, 574, 761 P.2d 970 (1988) (defendant stated that he did not want to waive his *Miranda* rights).

[35]*See* RCW 9.73.090(1)(b)(ii).

[36]RCW 9.73.090(1)(b)(ii).

[37]*State v. Cunningham*, 93 Wn.2d 823, 829, 613 P.2d 1139 (1980).

[38]101 Wn.2d 664, 685, 683 P.2d 571 (1984).

[39]*State v. Gelvin*, 43 Wn. App. 691, 696, 719 P.2d 580 (1986); *See also State v. Gonzalez*, 71 Wn. App. 715, 719, 862 P.2d 598 (1993).

## IV.

## CONCLUSION

The other assigned errors largely involve discretionary decisions and may not recur. Hence, we decline to address them.

We understand that a new trial will traumatize the victims and the community, especially after so long a period since the crime has passed, and particularly in a case where the defendant admits to killing two sheriff's deputies.[40] Yet two weighty errors occurred, both implicating Hutchinson's right to a fair trial. For the reasons outlined above, to find harmless error here would be equivalent to imposing a judge-directed criminal verdict, a tyranny our constitution forbids.[41] "The Sixth Amendment [right to a jury trial] requires more than appellate speculation about a hypothetical jury's action."[42] Consequently, this case must be remanded for a jury's verdict after full presentation of evidence and under proper instruction. We reverse the convictions and remand for retrial.

Cox, J., concurs.

GROSSE, J. (dissenting) — I dissent. While I agree that the self-defense instruction was error, applying the hindsight of *State v. LeFaber*,[43] decided after the trial in this case, I do not agree that the error requires reversal under these facts.

There were two distinct theories here as to what occurred in the breathalyzer room. The defense theory was that Hutchinson shot the deputies while standing in one

---

[40]*State v. Maupin*, 128 Wn.2d 918, 930, 913 P.2d 808 (1996).

[41]U.S. CONST. amend. VI; *State v. Miller*, 131 Wn.2d 78, 90-91, 929 P.2d 372 (1997); *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572, 97 S. Ct. 1349, 51 L. Ed. 2d 642 (1977).

[42]*Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993).

[43]*State v. LeFaber*, 128 Wn.2d 896, 913 P.2d 369 (1996).

corner, after they had slammed him up against a Plexiglas window, and as they were lunging at him again. This theory was backed by expert testimony regarding bullet trajectories and grease marks on the window, consistent with Hutchinson's story. The State's theory was that the fatal shots were fired while Hutchinson was seated in a different corner of the room away from the Plexiglas window and while the deputies were occupied with paperwork. This theory was also bolstered by expert testimony.

The events either happened in one part of the room or the other. If they happened as the State outlined them, then the error in the instruction could not have affected the outcome because no reasonable trier of fact could have found that Hutchinson had a reasonable belief that death or great bodily injury was intended, or that he was in any imminent danger of its being accomplished, particularly the latter. If the events happened as Hutchinson related them, and the defense argued them, then the error was harmless because the danger of the harm that Hutchinson reasonably believed was going to occur was by definition imminent because it was occurring at the moment he shot the officers. The reasonableness of his belief in that regard was irrelevant because he was reacting to an actual attack, not to a fear that an attack was in the offing. Therefore, even if the jury was misled as to the exact requisites of self-defense, it did not matter in this case.

Given Hutchinson's version of events, the difficult question was the reasonableness of his belief that the officers intended him harm, and whether that harm was of a nature that justified deadly force in response. The timing of his actions in response did not need to be explained in terms of his *perceptions* of danger. The officers were either assaulting him or they were not. In convicting, the jury either did not believe Hutchinson's version of events, or it believed the State's version. Neither version required the jury to decide what Hutchinson reasonably believed was about to happen to him.

If the jury believed the State's version of events, the error was even the more harmless. At trial, Hutchinson proffered no facts or argument that placed him in the chair in a seated position when he shot the deputies. And, it is easy to understand why. If the State's version is accepted, then he shot two unarmed men while they were turned away from him doing paperwork—a circumstance in which no reasonable trier of fact could find justification for his use of deadly force.[44] This case should end here.

Reconsideration denied July 14, 1997.

Review granted at 133 Wn.2d 1033 (1998).

---

[44]Despite the majority's ad hominem rhetoric, our role is to determine harmless error using as a test how a reasonable juror would interpret the instruction. *See State v. Miller*, 131 Wn.2d 78, 90, 929 P.2d 372 (1997). Performing that role is neither tyrannical nor hypothetical. Rather, it is our job.