[Nos. 35179-6-I; 35208-3-I. Division One. September 8, 1997.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL A. JACKSON, ET AL., *Appellants*.

*Thomas M. Kummerow* and *Richard R. Tassano* of *Washington Appellate Project*, for appellant Michael A. Jackson.

*Jeanette Brinster* of *Northwest Defenders Association*; and *Mark V. Watanabe* of *Nielsen, Broman & Associates, P.L.L.C.*, for appellant Laurinda J. Jackson.

*Norm Maleng, Prosecuting Attorney*, and *Theresa L. Fricke, Deputy*, for respondent.

WEBSTER, J. — Parents have a duty to care for and protect their children.[1] They can be held criminally liable as principals when, for example, they harm their child by failing to seek necessary medical care.[2] In this appeal, we address a parent's duty to protect in the context of accomplice liability. Instead of utilizing the pattern accomplice instruction, the trial court instructed the jury that it could find a parent to be an accomplice to a crime against the child, if, although physically capable, the parent failed to come to her aid. So instructed, the jury found both defendants guilty of felony murder for the death of their foster daughter.

We find no support in the accomplice statute's plain language for the trial court's modification to the pattern accomplice instruction. Further, the legislative history of the statute evidences an intent to reject accomplice liability for omissions. Under our statute, mere presence, in conjunction with an omission that breaches a duty to act, does not constitute aid to the perpetrator, or encouragement for the commission of a crime. Because the trial court's accomplice instruction misstated an essential element of criminal liability, the error cannot be harmless. As a result, we reverse and remand for a new trial.

## I.

### FACTS

Honking incessantly as he approached, Michael Jackson drove his unconscious three-year-old foster daughter to Valley General Hospital's emergency room. An emergency medical technician came to the car, and Michael told him that Breighonna fell from a swing, hit her head, and was

---

[1] *In re Hudson*, 13 Wn.2d 673, 712, 126 P.2d 765 (1942); *In re Potter*, 85 Wash. 617, 620, 149 P. 23 (1915); *State v. Williams*, 4 Wn. App. 908, 915, 484 P.2d 1167 (1971).

[2] 4 Wn. App. at 912; *State v. Morgan*, 86 Wn. App. 74, 936 P.2d 20 (1997); RCW 9A.42.020-.030.

having difficulty breathing. She wasn't breathing well, so the technician ran with her in his arms into the emergency room, seeking aggressive treatment.

Doctors and nurses responded, calling a "code" because Breighonna was unable to breathe. They undressed her, and summoned respiratory care, laboratory and x-ray technicians. They observed an array of bruises on her forehead, ears, arm, abdomen, thighs, crotch, and buttocks. When a technician started to catheterize her, she discovered a fresh labial abrasion. Breighonna's pupils were differently sized, neither responded to light, thus being indicative of serious brain injury. A CT scan showed massive, inoperable bleeding in her head. Her left forehead bruise enlarged during the two plus hours before Valley General transferred Breighonna to Harborview Medical Center by helicopter. After a CT scan there, the Harborview team determined that surgical intervention was futile. Breighonna died early the next evening.

Four medical professionals catalogued Breighonna's extensive injuries. Using a process known as iron staining, two of those professionals, the medical examiner and Dr. Kenneth Feldman (the prosecution's expert), gave opinions as to when they occurred. During the last three weeks of her life, Breighonna suffered bruises on her left arm, abdomen, the left side of her crotch, her buttocks, right forearm, and right scalp. Furthermore, a host of other inflicted injuries were less than three days old (or less than one and a half, depending on the expert's interpretation): two brain injuries (one of which was fatal and probably occurred the morning of the day Michael brought Breighonna to the hospital) evidenced by subdural hematomas (caused by blunt impact), a labial abrasion (extremely painful because young girls are not estrogenized), retinal hemorrhaging (likely caused by shaking), tin ear syndrome on both sides (an injury common to boxers, caused by blows to the head), lacerations and abrasions inside her mouth on skin other than her lips, and some buttocks bruises so deep that they hemorrhaged into

the gluteus maximus muscle. Every medical professional who testified considered the injuries to be completely inconsistent with the two explanations offered by the Jacksons: that Breighonna had fallen while having her hair cut two weeks before her death, and that she had fallen from a swing in the park on the morning of the day before she died. Dr. Newman testified that she had seen injuries this significant only in auto accident victims. The medical examiner and the prosecution's expert agreed that the cause of death was blunt impact to the head causing massive brain damage, marked by a subdural hematoma, and hemorrhaging inside the head, with swelling eventually impinging on the spine and brain stem.

In the days that followed, the Jacksons continued to maintain that Breighonna's injury occurred when she fell from a swing. But other points also emerged. Breighonna was incontinent of urine and bowel movements, and Laurinda spanked her 12-15 times for it on Wednesday (three days before Breighonna died). That night, when Breighonna had a bowel movement in her pants, Laurinda and Michael fought over who would help her change into her pajamas. It turned into a tug of war, with each of them tugging one of her arms. Then Michael eventually pushed Laurinda and they fell down, one of them on top of Breighonna. In a later interview, Michael also admitted that he once spanked Breighonna.

After consenting to a search and some interviews with police, the Jacksons fled to Florida. They were arrested and returned to Washington. The State charged each of them with felony murder, predicated on second degree assault and first degree criminal mistreatment. The State also charged Michael with one count of first degree rape of a child. The jury acquitted Michael on the first degree rape charge, but found both defendants guilty of felony murder. By special interrogatory, they unanimously

agreed that the State had proven both predicate crimes against both defendants.

## II.

## *DISCUSSION*

## A.

## Criminal Mistreatment

Both defendants argue that insufficient evidence supported the predicate felony of criminal mistreatment.

■ A person commits the crime of criminal mistreatment in the first degree when he recklessly causes great bodily harm to a child by withholding any of the basic necessities of life.[3] The "basic necessities of life" are "food, water, shelter, clothing, and health care."[4] The prosecution argues that the statute uses the term "shelter" to mean protection from a criminal act of a third person. We disagree. First, the most common meaning of "shelter" is something that affords protection from the elements.[5] Second, the prosecution's interpretation of "shelter" is difficult to reconcile with the rest of the phrase defining "basic necessities of life." Taken in context, "shelter," as used in "food, water, shelter, clothing, and health care," means protection from the elements. Furthermore, the prosecution's interpretation would create an open-ended, unmanageable standard. If "shelter" means protection from harm, would accidental harm trigger liability? Did the Legislature intend that every parent, regardless of their ability or stature, must intervene when a criminal act is perpetrated by a stranger or a sibling against their child? In conclusion, given its common meaning, the context in which it is used, and the uncontrollable breadth of defining it as protection from others, we hold that "shelter"

---

[3]RCW 9A.42.020.

[4]RCW 9A.42.010(1).

[5]WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2093 (1986).

means housing or protection from the elements. Thus, the alleged mistreatment relevant to this case is only the withholding of health care, not the withholding of shelter.

Strong evidence demonstrates that someone withheld medical care. The prosecution's expert witness, Dr. Kenneth Feldman, concluded that Breighonna died from a head injury inflicted with blunt trauma impact. Based on a high serum sodium, a low blood count, and CT scan, Dr. Feldman opined that Breighonna's injury occurred several hours before she was brought to the hospital. Therefore, the evidence supports the element of withholding medical care.

■ Another element of first degree criminal mistreatment is that the parent "recklessly causes great bodily harm to a child . . . by withholding any of the basic necessities of life."[6] Michael did delay taking Breighonna to Valley General hospital. She was unconscious when she arrived, but a person suffering significant brain injury is generally rendered unconscious. Based on a CT scan, Dr. Yang, the neurosurgeon, determined that the injury was inoperable due to massive bleeding. When Valley General discharged Breighonna (just under three hours after arrival), a nurse reluctantly categorized her condition as improved. Faced with a form that included only "stable, improved, unchanged, or deteriorated," the nurse chose "improved" because Breighonna's condition (according to a particular coma scale used) had changed, but had not deteriorated. Breighonna was flown by helicopter to Harborview Medical Center. A CT scan there showed surgical intervention to be futile.

Yet, after reviewing the testimony of an emergency medical technician, two nurses, three treating doctors, the medical examiner, a neurologist asked by the medical examiner to examine Breighonna's brain, and the prosecu-

---

[6]RCW 9A.42.020(1); *State v. Creekmore*, 55 Wn. App. 852, 859, 783 P.2d 1068 (1989).

tion's expert witness,[7] we find no evidence that the withholding *caused* great bodily harm.[8] Consequently, the evidence does not support the predicate felony of first degree criminal mistreatment, and we dismiss that charge.

## B.
### Jury Instruction: Accomplice Liability

This case involves a heinous crime against a defenseless child. The State's theme highlighted the Jacksons' contractual and legal obligations as parents. In becoming foster parents, they promised in writing to "not use any type of physical discipline."[9] Washington's administrative code prohibits corporal punishment by foster parents, and affirmatively requires them to "protect persons, while in the licensee's care, from child abuse or neglect."[10] The child abuse reporting statute imposes a criminal sanction for failing to report child abuse to law enforcement or the Department of Social and Health Services; in writing, the Jacksons promised to report any abuse.[11] And we have already cited common-law authority requiring parents to care for and protect their children.[12]

After the prosecutor marshaled this array of contractual and legal duties, the court agreed to modify the standard accomplice instruction. The court's twelfth instruction, largely modeled on WPIC 10.51, added lan-

---

[7]EMT Penquite, Nurses Keith and Leith, Drs. Bigler, Newman, and Winch, M.E. Dobersen, Dr. Alvord, and Kenneth Feldman, M.D.

[8]*Compare* Dr. Feldman's testimony in this case ("A child with brain injury of her severity is virtually never going to wake up after the event. Or if she had survived for many years or many days might've had sort of a vegetative state for her."), *with State v. Bartlett*, 74 Wn. App. 580, 589, 875 P.2d 651 (1994) (expert testified that the risk of permanent brain damage was increased because the victim did not receive prompt care).

[9]Ex. 41(c).

[10]WAC 388-73-048(1), 388-73-050.

[11]RCW 26.44.030(1), 26.44.080; Exs. 41(c), 65.

[12]See footnote 1.

guage that allowed the jury to find the Jacksons guilty as accomplices if they failed to protect Breighonna:

> Participant means an accomplice. A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
>
> > (1) solicits, commands, encourages, or requests another person to commit the crime or
> >
> > (2) aids or agrees to aid another person in planning or committing the crime.
>
> The word "aid" means all assistance whether given by words, acts, encouragement, support or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. *Unless there is a legal duty to act*, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice; *a legal duty exists for a parent to come to the aid of their small children if physically capable of doing so.*[13]

The Jacksons argue that Washington State does not allow accomplice liability for omitting to perform a legal duty. The State argues that a person who breaches a duty to act by omission is liable under Washington's accomplice statute.[14]

But Washington's accomplice statute does not address a failure to act within its plain words:

> (3) A person is an accomplice of another person in the commission of a crime if:

---

[13]Jury Instruction No. 12 (emphasis added).

[14]To see how other jurisdictions have addressed this issue, *compare Massachusetts v. Raposo*, 413 Mass. 182, 595 N.E.2d 773 (1992), and *Vermont v. Kemp*, 160 Vt. 647, 640 A.2d 1 (1993), *with Mobley v. Indiana*, 227 Ind. 335, 85 N.E.2d 489, 492-93 (1949); *Kansas v. Smolin*, 221 Kan. 149, 557 P.2d 1241, 1245-46 (1976); *North Carolina v. Walden*, 306 N.C. 466, 293 S.E.2d 780, 787 (1982); *Wisconsin v. Williquette*, 125 Wis. 2d 86, 370 N.W.2d 282, 284-85 (Ct. App. 1985), *aff'd on other grounds*, 129 Wis. 2d 239, 385 N.W.2d 145 (1986); and *Illinois v. Stanciel*, 153 Ill. 2d 218, 606 N.E.2d 1201, 1211 (1992).

(a) With knowledge that it will promote or facilitate the commission of the crime, he

(i) solicits, commands, encourages, or requests such other person to commit it; or

(ii) aids or agrees to aid such other person in planning or committing it; . . .

RCW 9A.08.020. Washington's accomplice liability statute largely mirrors the Model Penal Code formulation.[15] Yet, when Washington utilized the Model Penal Code's complicity provisions, it declined to adopt a subsection that specifically imposed liability for omission:

(3) A person is an accomplice of another person in the commission of an offense if:

(a) with the purpose of promoting or facilitating the commission of the offense, he

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(iii) *having a legal duty to prevent the commission of the offense, fails to make proper effort so to do;*[16]

It therefore appears that the Legislature's rejection of omission liability was deliberate.[17] The Legislature evidently decided that an accomplice's omission to perform a duty contributes nothing to a principal's perpetration of a criminal act.

---

[15]REVISED WASHINGTON CRIMINAL CODE (RWCC) 44-45 cmt. (1) to proposed RCW 9A.08.060 (Legis. Council's Judicial Comm. 1970) (later adopted as RCW 9A.08.020); WASHINGTON STATE CRIMINAL JUSTICE TRAINING COMMISSION, REVISED CRIMINAL CODE TRAINING AND SEMINAR MANUAL 9A.08.020-2 (Gordon A. Golob ed., 1976) (Model Penal Code 2.06 was "primary source" for RCW 9A.08.020); *State v. Rodriguez*, 78 Wn. App. 769, 773 n.1, 898 P.2d 871 (1995), *review denied*, 128 Wn.2d 1015, 911 P.2d 1343 (1996).

[16]I MODEL PENAL CODE 2.06(3)(i)-(iii) (1985) (emphasis added).

[17]RWCC 44-47 cmt. to proposed RCW 9A.08.060; *see also* RCW 9A.32.010 (including omission within definition of homicide), and RCW 9A.08.030(2)(a) (corporations liable for omitting to discharge legal duties).

What is more, at least eight states' statutes include a pure omission prong; two others have a hybrid omission prong, mingling inaction with promotion or benefit.[18] As a dissenting justice wrote, when referring to imposing liability for omission, "[s]uch action by a legislature may well be commendable, but by a court condemnable."[19] First, the legislature can best determine how to circumscribe the duty — for example, should an abused spouse be under the same duty to intervene as one not being coerced?[20] Second, requiring the legislature to *expressly* impose such liability supports a fundamental policy underlying the criminal code: "[t]o give fair warning of the nature of the conduct declared to constitute an offense."[21] Finally, this interpretation is supported by later enactments in which the Legislature imposed liability on parents who endanger or harm their children by withholding the basic necessities of life.[22] Because the Legislature declined to adopt the omission prong of the Model Penal Code's complicity statute, we reject the State's argument that Washington's statute allows accomplice liability for the omission to perform a legal duty. Hence, we hold that the trial court erred when it so instructed the jury.

## C.

### Harmless Error

█ The sixth amendment guarantees the right to a jury .

---

[18]ALA. CODE § 13A-2-23(3) (1975); ARK. CODE ANN. § 41-303(a)(3) (Michie 1975); DEL. CODE ANN. tit. 11, § 271(2)(c) (1953); HAW. REV. STAT. § 702-222(1)(c) (1972); KY. REV. STAT. ANN. § 502.020(2)(c) (Michie 1974); N.J. STAT. ANN. § 2C:2-6c(1)(c) (West 1978); N.D. CENT. CODE § 12.1-03-01(1)(b) (1973); OR. REV. STAT. § 161.155(2)(c) (1971); TENN. CODE ANN. § 39-11-402(3) (1989); TEX. PENAL CODE ANN. § 7.02(a)(3) (West 1973).

[19]*Wisconsin v. Williquette*, 129 Wis. 2d 239, 385 N.W.2d 145, 156 (1986) (Heffernan, C.J., dissenting).

[20]*See, e.g.*, MINN. STAT. § 609.378(2) (1993) (making reasonable apprehension of substantial bodily harm an affirmative defense to knowingly permitting physical or sexual abuse of a child).

[21]RCW 9A.04.020(1)(c).

[22]RCW 9A.42.020, .030 (criminal mistreatment) (enacted in 1986).

trial.[23] The fifth amendment requires the state to establish all elements of guilt beyond a reasonable doubt.[24] Together, they guarantee a criminal defendant the right to have a jury determine, beyond a reasonable doubt, every essential element of guilt.[25] This guarantee affects the availability, to an appellate court, of the harmless error doctrine.[26] Its availability is limited because of the manner in which courts are required to apply the harmless error doctrine. A court applying harmless error doctrine decides whether the actual guilty verdict was surely unattributable to the error; it does not decide whether a guilty verdict would have been rendered by a hypothetical jury faced with the same record, except for the error.[27]

If the jury is instructed in a manner to relieve the state of its burden to establish every element of guilt, automatic reversal is sometimes required.[28] Some instructional omissions or misstatements are so fundamental that verdicts upon which they are based are altogether insusceptible of harmless error analysis. For example, in *Sullivan v. Louisiana*,[29] the "reasonable doubt" instruction was constitutionally infirm. Consequently, the actual verdict did not satisfy the "beyond a reasonable doubt" standard. "There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the same verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly

---

[23]*Sullivan v. Louisiana*, 508 U.S. 275, 278, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993).

[24]*In re Winship*, 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

[25]*United States v. Gaudin*, 515 U.S. 506, 115 S. Ct. 2310, 2319, 132 L. Ed. 2d 444 (1995).

[26]*State v. Allen*, 101 Wn.2d 355, 358, 678 P.2d 798 (1984); *State v. Eastmond*, 129 Wn.2d 497, 503, 919 P.2d 577 (1996).

[27]*State v. Smith*, 131 Wn.2d 258, 266, 930 P.2d 917 (1997).

[28]*State v. Byrd*, 125 Wn.2d 707, 714, 887 P.2d 396 (1995).

[29]508 U.S. 275.

meaningless."[30] Harmless error analysis is incompatible with the absence of an actual verdict beyond a reasonable doubt.[31] Lacking a formal verdict, the appellate court would be infringing the right to a jury trial by holding that no reasonable jury would have found otherwise.[32]

In some appeals that involve omissions or misstatements of elements in jury instructions, however, a harmless error analysis may be undertaken.[33] But only if the misstatement or omission does not prevent the jury from actually considering the element.[34] When the jury, as instructed, *necessarily* found facts that establish guilt beyond a reasonable doubt on every essential element, the actual verdict satisfies the core constitutional provisions discussed above.[35] That is to say, the actual verdict has determined, beyond a reasonable doubt, every essential element of guilt. Under those circumstances, the court can apply harmless error analysis, and decide the effect that the erroneous instruction had on the trial.[36]

But in other cases, an erroneous instruction on an element of guilt allows the jury to return a verdict without necessarily deciding the element.[37] Then, the actual verdict is not a jury determination beyond a reasonable doubt as

---

[30]*Sullivan*, 508 U.S. at 280.

[31]*Carella v. California*, 491 U.S. 263, 269, 109 S. Ct. 2419, 105 L. Ed. 2d 218 (1989) (Scalia, J., concurring).

[32]*California v. Roy*, 519 U.S. 2, 117 S. Ct. 337, 339, 136 L. Ed. 2d 266 (1996) (Scalia, J., concurring).

[33]*Pope v. Illinois*, 481 U.S. 497, 502-03, 107 S. Ct. 1918, 95 L. Ed. 2d 439 (1987).

[34]481 U.S. at 503; *Yates v. Evatt*, 500 U.S. 391, 405, 111 S. Ct. 1884, 114 L. Ed. 2d 432 (1991).

[35]*Yates v. Evatt*, 500 U.S. at 404; *California v. Roy*, 519 U.S. 2, 117 S. Ct. 337, 339-40, 136 L. Ed. 2d 266 (1996) (Scalia, J., concurring) ("The error in this present case can be harmless only if the jury verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict did find without finding this point as well.").

[36]*Sullivan*, 508 U.S. 275, 181.

[37]*Byrd*, 125 Wn.2d at 715.

to every essential element of guilt.[38] An appellate court cannot affirm the conviction by characterizing the error as harmless; in the absence of an actual jury determination as to guilt on every essential element of guilt, applying harmless error analysis is tantamount to directing a verdict.[39] Without question, the court cannot direct a verdict against a criminal defendant.[40]

Under our statute, to be guilty as an accomplice, the state must prove (1) mens rea; *and*, (2) that the defendant either (a) solicited, commanded, encouraged, or requested the other person to commit a crime, or (b) aided or agreed to aid such other person in planning or committing it; *and* (3) a completed crime.[41] The trial court in this case rewrote the accomplice statute to include liability for omitting to perform a legal duty:

> The word "aid" means all assistance whether given by words, acts, encouragement, support or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. *Unless there is a legal duty to act*, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice; *a legal duty exists for a parent to come to the aid of their small children if physically capable of doing so.*[42]

This instruction excused the jury from the necessity of finding something more than mere presence and knowledge of another's criminal activity in order to convict either defendant as an accomplice. Although the jury may have found the statutory elements, *and* also found breach of a duty to intervene, neither the verdict, nor the instruc-

---

[38]*Eastmond*, 129 Wn.2d 497, 503-04.

[39]*California v. Roy*, 117 S. Ct. 337, 339 (Scalia, J., concurring).

[40]*State v. Williams*, 22 Wn. App. 197, 201, 588 P.2d 1201 (1978); *State v. Hutchinson*, 85 Wn. App. 726, 742, 938 P.2d 336 (1997).

[41]RCW 9A.08.020(3).

[42]Jury Instruction no. 12 (emphasis added).

tions assure us that they actually did so.[43] Thus, the actual verdict in this case was not a jury determination that every essential element of guilt was proven beyond a reasonable doubt.[44] Given the absence of a actual verdict beyond a reasonable doubt on every essential element of guilt, the fifth and sixth amendments prohibit a harmless error analysis. The error requires reversal of both convictions.

## D.
### Sufficiency of the Evidence: Second Degree Assault

Michael Jackson contends that insufficient evidence supports the second degree assault predicate felony. Specifically, he argues that the prosecution failed to establish one means of committing assault upon which the jury was instructed: knowingly inflicting bodily harm that "by design causes such pain or agony as to be the equivalent of that produced by torture."[45]

Only one published Washington case construes this statute.[46] And in that case, a father struck his son eight or nine times on the buttocks with a belt or a stick. The victim screamed as his father hit him. The belt buckle came in contact with the child's buttocks, and the father admitted using "a little too much force."[47] The court held that evidence sufficient to establish the infliction of severe or intense pain as punishment or coercion, or for sheer cruelty, and hence torture.[48]

■ In this case, the evidence is substantially stronger. Breighonna suffered two brain injuries. That type of injury

---

[43]*State v. Salas*, 74 Wn. App. 400, 407, 873 P.2d 578 (1994); *State v. Roberts*, 88 Wn.2d 337, 344, 562 P.2d 1259 (1977).

[44]*Byrd*, 125 Wn.2d at 716.

[45]RCW 9A.36.021(g).

[46]*State v. Brown*, 60 Wn. App. 60, 67, 802 P.2d 803 (1990).

[47]60 Wn. App. at 67.

[48]60 Wn. App. at 68.

usually results in vomiting and almost inevitably results in immediate (even if temporary) unconsciousness. The labial abrasion, which was not self-inflicted, would have been extremely painful. The severe bruising, particularly deep bruising to her buttocks, could not have been anything except tender and painful. Her ear injuries, commonly associated with boxers because they are hit in the head, were obviously painful. Moreover, the jury could have drawn fair inferences from photographic evidence.[49] We have reviewed the photos and the medical testimony; we hold that the evidence was sufficient to establish pain and agony as to be the equivalent of torture.

### E.

#### Sufficiency of the Evidence: Causation

Laurinda Jackson argues that the evidence was insufficient to convict her of felony murder either as a principal or an accomplice.

The State focused on accomplice liability. In this regard, it had to prove the underlying crime (second degree assault during which a participant caused the death of a nonparticipant),[50] and that Laurinda was accountable for Michael's act.[51] Laurinda's brief focuses on whether she personally caused Breighonna's death. Her argument relies on a cursory contention that her absence from the house on Friday morning, when the fatal blow may have been struck, makes accomplice liability impossible. But an accomplice need not be physically present for the crime.[52] "A person who is an accomplice in the

---

[49]60 Wn. App. at 67.

[50]RCW 9A.32.050(1)(b); *State v. Peterson*, 54 Wn. App. 75, 78-79, 772 P.2d 513 (1989).

[51]RCW 9A.08.020(1)-(2).

[52]*State v. Boast*, 87 Wn.2d 447, 455, 553 P.2d 1322 (1976).

commission of a crime is guilty of that crime whether present at the scene or not."[53]

Instead, a person is an accomplice if, with knowledge that it will promote or facilitate the commission of the crime, she aids, agrees to aid, or encourages any other person in planning and committing it.[54] In other words, she must associate with the undertaking, participate in it as in something she desires to bring about, and seek by her action to make it succeed.[55] Having agreed to participate in a criminal act, the accomplice risks that the primary actor will exceed the scope of the preplanned illegality.[56] Hence, "[a]iding in the commission of a felony which results in an unintended death subjects the accomplice to liability for murder."[57] In this sense, accomplice liability is not a separate crime: it is predicated on aid to another in the commission of a crime, and is, in essence, liability for that crime.[58] Yet, accomplices need only have general knowledge that they assist the principal in committing a crime, rather than specific knowledge of the elements of the principal's crime.[59]

Laurinda's argument implicitly concedes that a second degree assault occurred, during which the perpetrator caused a nonparticipant's death. Thus, the issue is whether sufficient evidence supported the jury finding that she aided in the commission of, or encouraged, that assault. Here, the evidence established that Laurinda and/or Michael inflicted numerous injuries on the three-year-old victim in the three days prior to her death. Laurinda was gone only once during that three-day period — to work a four-hour shift. During that shift, her employer noticed

---

[53] WPIC 10.51.

[54] RCW 9A.08.020(3)(a)(i)-(ii).

[55] *In re Wilson*, 91 Wn.2d 487, 491, 588 P.2d 1161 (1979).

[56] *State v. Davis*, 101 Wn.2d 654, 658, 682 P.2d 883 (1984).

[57] *United States v. Greer*, 467 F.2d 1064, 1069 n.4 (7th Cir. 1972).

[58] *State v. Peterson*, 54 Wn. App. 75, 78.

[59] *State v. Ferreira*, 69 Wn. App. 465, 472, 850 P.2d 541 (1993).

that she was acting strangely. She later admitted to an unreasonable number of spankings over the course of the three days (12 —15 times on one day), spanking that probably caused the buttocks injuries. One expert's opinion as to the timing of Breighonna's brain injury supported the possibility that the injury was inflicted on Breighonna prior to Laurinda's departure for work on the morning of the day Michael took Breighonna to the hospital. This evidence, and the constellation of injuries, combined with Laurinda's role in their infliction, was sufficient for a reasonable fact finder to conclude that Laurinda associated with the undertaking and participated in it so as to be an accomplice to the final assault — even if absent.

We reverse the convictions, and remand for a new trial.

BECKER, J., concurs.

AGID, J. (dissenting) — I agree with the majority on all but one point which, in my view, would dictate affirming the convictions. Assuming the accomplice instruction is error, it is harmless. We should affirm the Jacksons' convictions for felony murder based on assault as the predicate crime because they would have been convicted on the evidence presented even if the trial court had given the standard WPIC accomplice instruction.

Because accomplice liability is not an alternative means of committing a crime, a jury need not be unanimous about whether a defendant acted as a principal or accomplice in committing a crime. *State v. Hoffman*, 116 Wn.2d 51, 105, 804 P.2d 577 (1991) (" 'it matters not that some jurors may have believed that the petitioner fired the gun, while others may have believed that his only role was in aiding and abetting [the other participant], so long as all twelve agreed that he did participate' ") (quoting *State v. Carothers*, 84 Wn.2d 256, 265, 525 P.2d 731 (1974)); *State v. Munden*, 81 Wn. App. 192, 197, 913 P.2d 421 (1996). A defendant need not participate in each element of the crime nor need he share the same mental state as is

required of the principal. *State v. Galisia*, 63 Wn. App. 833, 840, 822 P.2d 303, *review denied*, 119 Wn.2d 1003 (1992). Nor, as the majority recognizes, does the accomplice have to be present when the crime is actually committed. *State v. Boast*, 87 Wn.2d 447, 455, 553 P.2d 1322 (1976). And, perhaps most important in this case, accomplices need have only general knowledge that they are encouraging or assisting in committing the crime. *State v. Ferreira*, 69 Wn. App. 465, 472, 850 P.2d 541 (1993). For all these reasons, the majority agrees that the jury could easily have found that Laurinda was, as the State argued in closing, Michael's accomplice when he struck the fatal blow after she left for work. Majority at 815.

My quarrel with the majority is that it assumes the error on instructing the jury about the duty of foster parents to protect their children is fatal in this case. As I understand the rule, instructional error is harmless "only when the record affirmatively establishes that the manner in which the instruction was worded could have no effect on the outcome of the case." *State v. Crane*, 116 Wn.2d 315, 331, 804 P.2d 10, *cert. denied*, 501 U.S. 1237 (1991). Under the facts of this case, the duty to protect the child was irrelevant. The evidence established beyond a reasonable doubt that Laurinda participated fully in the days of abuse that culminated in inflicting the fatal blow. Whether or not she had an affirmative duty to protect her foster child, by her active participation in the continuing and escalating course of assaults and her acquiescence in Michael's assaults, she encouraged him to continue to beat the child. As the majority recognizes and the State argued to the jury, both parents tortured Breighonna for several days and at no time did either try to stop the other's behavior. They were parents participating in a common enterprise, and it did not take a jury instruction on the parental duty to protect to inform the jury that by failing to stop, protest, interfere or otherwise change the course of events, each parent was participating in and encouraging the other to assault the child.

Under these circumstances, both Michael and Laurinda

had established by their actions over a three-day period that the other could continue to beat Breighonna at will. Each was the other's accomplice in a course of conduct that culminated in one of them inflicting the fatal blow. When the evidence of complicity and conspiracy is as strong as it is in this case, we need not be concerned that the jury could have been misled. I would hold that the presumed instructional error was harmless beyond a reasonable doubt because the parental duty language in the accomplice instruction was irrelevant under these facts and the jury would have found them guilty as principal and accomplice with or without it.

Reconsideration denied October 7, 1997.

Review granted at 135 Wn.2d 1008 (1998).