[No. 46328-0. En Banc. November 10, 1982.]

THE STATE OF WASHINGTON, *Respondent,* v. MICHAEL G. ROBTOY, *Appellant.*

*David Middaugh,* for appellant.

*C. Danny Clem, Prosecuting Attorney,* and *Kenneth G. Bell, Deputy,* for respondent.

WILLIAMS, J.—Appellant Michael Robtoy seeks review of his aggravated first degree murder conviction. He contends the conviction should be reversed because the trial court erroneously admitted: (1) his confession to the crime charged; and (2) evidence of prior criminal conduct. Additionally, appellant requests this court's permission to withdraw his "not guilty" plea so that he may plead again and thereby avoid the sentence of life imprisonment without possibility of parole. For the reasons set forth below, we affirm appellant's conviction and sentence.

The facts are as follows:

Michael Robtoy was arrested on February 5, 1979, near Umatilla, Oregon, on a charge of being an escapee from a Washington State correctional facility. At the time of his arrest, Robtoy was advised of his constitutional rights in accordance with the United States Supreme Court's decision in *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). On February 7, 1979, Detective Jack Dean of the Kitsap County Sheriff's Office and Trooper Rusty Simpson of the Oregon State Police went to interview Robtoy at the Umatilla County Jail. Detective Dean again advised Robtoy of his constitutional rights from a form supplied by Trooper Simpson. Robtoy initialed each right and signed a waiver of those rights in the presence of Dean and Simpson.

Detective Dean then began taking a statement from Robtoy whereby Dean would type a question, read it to Robtoy, have Robtoy give an oral answer, and then Dean would type the answer below the question. At the completion of each page, Robtoy read the answers and initialed his approval at the bottom of each page. At the bottom of page 3 of the statement, the discussion turned to David King, whose murder Detective Dean was investigating. Dean asked Robtoy if he could think of anything important regarding King's death, and Robtoy answered negatively. In response to a question asked by Dean, Robtoy stated that King had made no suggestion to him that they engage in "sexual activities". He also said that he had none of King's personal property.

Detective Dean testified at the pretrial omnibus hearing that he believed Robtoy had been untruthful with him to that point, but he felt Robtoy wanted to speak with someone about the incident. Dean and Robtoy then had a conversation that was not recorded in any way and to which each testified differently.

Dean testified that he told Robtoy the questions would get tougher from that point onward. He talked with Robtoy in an apparent attempt to convince Robtoy that he understood him and that they were "communicating". Robtoy said he was tired of running and needed help. Dean told Robtoy whatever he said "might result in death" (2 Report of Proceedings, at 200), and Robtoy then said, more to himself than anyone else: "Maybe I should call my attorney." After a short pause, Dean said: "Mike, if you say you want your attorney, this conversation ends right here". 2 Report of Proceedings, at 201. Robtoy then acknowledged his understanding of the above statement.

Detective Dean testified Robtoy had trouble starting to talk, so Dean told Robtoy that he would start typing questions and that "if we arrived at a point where he didn't want to answer any questions, he didn't want to say anything more or he wanted his attorney, to say so". 2 Report of Proceedings, at 202. Robtoy agreed to the arrangement.

He asked neither Detective Dean nor Trooper Simpson for an attorney. Eventually, Dean and Robtoy continued the question and answer format described above.

Robtoy's testimony was different in that he recalled asking for an attorney unequivocally: "You're getting in over my head, and I want to see an attorney." 2 Report of Proceedings, at 369. He stated his belief that Dean had "badgered" him into confessing and alleged that Dean made promises to him of referral to the Western State mental hospital.

Robtoy admitted that he was with David King when he died. After he had sexual relations with King, King tried to convince Robtoy the best thing to do was to call the police and turn himself in. King knew Robtoy was on furlough from the Clearwater Correction Center and that he had failed to return on time. Robtoy told Detective Dean that he "just panicked and started choking him." State's exhibit 65, at 4. Robtoy began choking King with his arm, but when his arm got sore he wrapped an electrical cord from a clock radio around King's neck and continued strangling him. He later took King's radio, a hat, two shirts, a pair of pants, a suitcase, and King's jeep and drove away.

When asked why he was telling the truth, Robtoy replied: "I am hoping for maybe getting some help. It makes a person feel better. Maybe now I can get some help." In answer to the question why he was talking to Detective Dean instead of an attorney, Robtoy said: "What could he do for me, there is nothing that he could do for me." State's exhibit 65, at 5.

At the conclusion of the King murder statement, Detective Dean went on to question Robtoy about the death of Ruth Pitts in Gig Harbor. Robtoy explained that he met Pitts at a bar where they drank together until he accompanied Pitts to her home. Robtoy said they had sex, began to quarrel, and he began choking her with his hands until he jerked her neck and heard a snap. (Ruth Pitts was later found strangled with a T-shirt tied around her neck.) Robtoy was unsure about what occurred next, but he did recall

taking some beer bottles from a closet to return for the deposit money. He also found a money order in Ruth Pitts' jacket pocket and cashed it at the Bremerton post office.

Robtoy waived extradition and was transported back to Kitsap County by Detective Dean. On February 9, 1979, the Kitsap County prosecutor charged Robtoy with premeditated murder in the first degree for King's death. On February 26, 1979, the prosecutor filed a notice of intention to seek the death penalty and asserted, as an aggravating circumstance, that Robtoy had escaped from or was on unauthorized leave from a state correctional institution at the time of the killing. *See* former RCW 9A.32.045(1)(b).

Prior to trial, the trial court ruled Robtoy's confession could be introduced as evidence because his statements concerning an attorney were equivocal, and because there had been a valid waiver prior to the voluntary confession. The court found that on at least 14 previous occasions, Robtoy had been advised of his *Miranda* rights. On some occasions he waived those rights, but on other occasions he exercised his right to terminate further questioning. A pretrial hearing also was held concerning admissibility of the Ruth Pitts homicide in the State's case in chief. The trial court ruled the evidence would be admissible to show motive and/or premeditation, and found the probative value outweighed the prejudicial effect of the evidence. The court gave a cautionary instruction that the Pitts evidence could be considered only for the limited purpose of showing premeditation and motive.

On June 1, 1979, a jury convicted appellant Michael Robtoy of the aggravated first degree murder of David King. On June 4, 1979, the jury recommended the death penalty after a sentencing hearing pursuant to former RCW 10.94.020. An automatic appeal to this court followed whereby Robtoy was made one of the appellants in the consolidated death penalty appeal in *State v. Frampton*, 95 Wn.2d 469, 627 P.2d 922 (1981). Robtoy's death sentence was vacated in the *Frampton* case, and he now faces a sentence of life imprisonment without possibility of parole.

On May 12, 1981, Robtoy filed a motion in Kitsap County Superior Court seeking to withdraw his plea of not guilty and enter a plea of guilty to first degree murder. The trial court declined to rule on the motion without this court's permission. Thereafter, Robtoy filed a motion in this court requesting permission for the trial court to enter a decision on the plea withdrawal issue, pursuant to RAP 7.2(e). Robtoy sought an additional ruling that he could not be retried under the 1981 death penalty act if his conviction was later reversed. These motions were denied by this court on September 25, 1981. On February 5, 1982, we retained this case to answer the issues presented herein.

## I
### ADMISSIBILITY OF ROBTOY'S CONFESSION

In *Miranda v. Arizona,* 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), the United States Supreme Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self–incrimination required that custodial interrogation be preceded by advice to the accused that he has the right to remain silent and the right to the presence of an attorney. If the accused "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (Footnote omitted.) *Miranda,* at 473–74. If he requests counsel, "the interrogation must cease until an attorney is present." *Miranda,* at 474.

The *Miranda* decision recognizes that, under certain circumstances, the person being interrogated may validly waive the right to counsel. *Miranda,* at 475. If the interrogation continues without the presence of an attorney, the state has the heavy burden of establishing the defendant's waiver of his privilege against self–incrimination and his right to retained or appointed counsel. *Escobedo v. Illinois,* 378 U.S. 478, 490 n.14, 12 L. Ed. 2d 977, 84 S. Ct. 1758 (1964). The state can satisfy this burden if it can prove the voluntariness of the statement by a preponderance of the

evidence. *Lego v. Twomey,* 404 U.S. 477, 486–87, 30 L. Ed. 2d 618, 92 S. Ct. 619 (1972); *State v. Braun,* 82 Wn.2d 157, 162, 509 P.2d 742 (1973). The waiver must be: (1) knowing; (2) voluntary; and (3) an intelligent relinquishment of a known right. Whether a waiver by the defendant is shown depends in each case "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards v. Arizona,* 451 U.S. 477, 482, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981), quoting from *Johnson v. Zerbst,* 304 U.S. 458, 464, 82 L. Ed. 1461, 58 S. Ct. 1019 (1938). In a footnote to the *Miranda* decision, the Supreme Court noted its agreement that the interviewing agent must exercise his judgment in determining whether the individual waives his right to counsel, but stated the standard for waiver is necessarily high and the ultimate responsibility for resolving the constitutional question lies with the courts. *Miranda,* at 486 n.55.

Recently, we decided the case of *State v. Pierce,* 94 Wn.2d 345, 618 P.2d 62 (1980), which involved the question of whether a defendant could validly waive his previously asserted right to counsel when questioning was later reinitiated by the police. We determined that such a waiver was possible under the following circumstances:

> To summarize, the rule that we draw from *Miranda, Mosley* [*Michigan v. Mosley,* 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975)], and *Innis* [*Rhode Island v. Innis,* 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980)] is that the police may question a suspect who has once cut off questioning by requesting an attorney as long as (1) the right to cut off questioning was scrupulously honored, (2) the police engaged in no further words or actions amounting to interrogation before obtaining a valid waiver or assuring the presence of an attorney, (3) the police engaged in no tactics which tended to coerce the suspect to change his mind, and (4) the subsequent waiver was knowing and voluntary.

*Pierce,* at 352. Subsequently, the United States Supreme Court decided *Edwards v. Arizona, supra,* a case factually

similar to *Pierce*. The *Edwards* opinion seems to settle the question of whether the right to counsel can be waived after it has been once asserted:

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police–initiated custodial interrogation even if he has been advised of his rights. *We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.*

(Footnote omitted. Italics ours.) *Edwards,* at 484–85. Clearly, insofar as *Pierce* indicates that the police may again engage in questioning after the accused requests the presence of an attorney, it is now overruled by *Edwards*.[1] Once a suspect requests the presence of an attorney, *Edwards* makes it clear there can be no further questioning until an attorney is provided unless the suspect himself reestablishes a line of communication with the police. *Edwards,* at 484–85. As stated by the Court in *Edwards,* "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Edwards,* at 485.

In *Michigan v. Mosley,* 423 U.S. 96, 104 n.10, 46 L.

---

[1]Although the four factors we identified in *State v. Pierce,* 94 Wn.2d 345, 352, 618 P.2d 62 (1980) as bearing on the determination of whether an accused waived the right to counsel after previously asserting the right are no longer valid under *Edwards v. Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981), those factors have continuing validity in determining subsequent waivers in two other situations. First, those factors are relevant to the question of the validity of a subsequent waiver of the right to remain silent. *Michigan v. Mosley,* 423 U.S. 96, 104 n.10, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975); *see also Mosley,* at 110 (White, J., concurring in the result). Second, those factors are relevant to the validity of a waiver of the right to counsel if, as contemplated by *Edwards,* the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards,* at 484–85.

Ed. 2d 313, 96 S. Ct. 321 (1975), the Court noted that *Miranda* distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and required that interrogation cease until an attorney was present only if the individual stated that he wanted counsel. Thus, the question now before us is whether Robtoy in fact invoked his Fifth Amendment right to counsel when he said, "Maybe I should call my attorney." 2 Report of Proceedings, at 201. Certainly, if Robtoy had made an unequivocal request for an attorney, the rule of *Edwards* would be applicable to prevent any further questioning. In the *Edwards* case itself, the Supreme Court hinted that a different rule may well apply if the request is equivocal in nature:

> The rule in the Fifth Circuit is that a knowing and intelligent waiver cannot be found once the Fifth Amendment right to counsel has been *clearly* invoked unless the accused initiates the renewed contact. See, *e. g., United States* v. *Massey,* 550 F. 2d 300 (1977); *United States* v. *Priest,* 409 F. 2d 491 (1969). Waiver is possible, however, when the request for counsel is *equivocal. Nash* v. *Estelle,* 597 F. 2d 513 (CA5 1979) (en banc). See *Thompson* v. *Wainwright,* 601 F. 2d 768 (CA5 1979).

(Italics ours.) *Edwards,* at 486 n.9.

In *Nash v. Estelle,* 597 F.2d 513 (5th Cir.) (en banc), *cert. denied,* 444 U.S. 981, 62 L. Ed. 2d 409, 100 S. Ct. 485 (1979), the Fifth Circuit Court of Appeals established the rule that if a suspect makes an equivocal request for an attorney, interrogation about any offense must cease and questioning must be confined to clarifying the suspect's wishes regarding an attorney. *Nash,* at 517–18. The *Nash* court expressed its adherence to the rule set forth in *United States* v. *Priest,* 409 F.2d 491, 493 (5th Cir. 1969) that when a suspect makes an unequivocal request for an attorney's presence, there can be no inquiry as to the subsequent waiver of that right. *Nash,* at 517. When a suspect who has been informed of his rights expresses both a desire for counsel and a desire to continue the interview without the presence of counsel, however, it is permissible for the

questioning official to make further inquiry to clarify the suspect's wishes. *Nash,* at 517–18. *Accord, United States v. Weston,* 519 F. Supp. 565, 572 (W.D.N.Y. 1981); *Jurek v. Estelle,* 623 F.2d 929, 939 (5th Cir. 1980) (en banc); *Giacomazzi v. State,* 633 P.2d 218, 222 (Alaska 1981); *Vaughn v. State,* 248 Ga. 127, 131, 281 S.E.2d 594 (1981); *State v. Clawson,* 270 S.E.2d 659, 670 (W. Va. 1980). Any questioning after the equivocal assertion of the right to counsel must be strictly confined to clarifying the suspect's request.

> [W]henever even an equivocal request for an attorney is made by a suspect during custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified.

*Thompson v. Wainwright,* 601 F.2d 768, 771 (5th Cir. 1979). The court in *Nash* went on to warn that an interrogating officer may not utilize the guise of clarification as a subterfuge for eliciting a waiver of the previously asserted request for counsel. *Nash,* at 517–18. *See also State v. Cody,* 293 N.W.2d 440, 446 (S.D. 1980).

The Fifth Circuit rule, cited with seeming approval by the United States Supreme Court in *Edwards,* at 486 n.9, appears to us to be the most reasonable approach to dealing with an equivocal request for counsel. Otherwise, the mere mention by the suspect of the word "attorney" takes on talismanic significance. We believe the Fifth Circuit's distinction between equivocal and unequivocal requests for an attorney gives a suspect the proper amount of protection to his rights without unduly burdening the police from taking voluntary statements. *See Michigan v. Mosley, supra.* We note that the reasoning of *Nash v. Estelle, supra,* was recently adopted by Division Two of the Court of Appeals in *State v. Lewis,* 32 Wn. App. 13, 20–22, 645 P.2d 722 (1982). We now join in the adoption of that Fifth Circuit rule. At the same time, we express the same admonition as the Fifth Circuit that we will not permit interrogating officers to use the guise of clarification as a subterfuge for elic-

iting a waiver of the previously asserted right to counsel. In examining an alleged waiver of the right to counsel, we will continue to "indulge in every reasonable presumption against waiver." *Brewer v. Williams,* 430 U.S. 387, 404, 51 L. Ed. 2d 424, 97 S. Ct. 1232 (1977).

The trial court in the present case found Robtoy's statement was not an unequivocal request for an attorney. This finding is supported by Detective Dean's testimony that when Robtoy said, "Maybe I should call my attorney", he appeared to be thinking out loud instead of making a request for an attorney. Detective Dean's testimony about his exchanges with Robtoy regarding an attorney is as follows:

A: . . . He was—like he appeared to be thinking like this (demonstrating), and he said that—He said, "Maybe I should call my attorney." I recall that he waited for a while, and he paused there, and I told him, you know, *"Mike, if you say you want your attorney, this conversation ends right here,"* and he said that he knew that. Q: Who did he direct that comment at or towards? A: Well, he—Me and Rusty [Simpson] were in the room, but he directed that comment—It was kind of like a thought to himself. It was kind of like "I know I could do that. Maybe I should, but I'm still—" You know, like he was still considering "I'm going to—" like he knew he had this problem, and it wasn't going to go away, and "I want to tell somebody about it." Q: Did he ask Trooper Simpson for an attorney? A: He did not. Q: Did he ask you for an attorney? A: No. Q: How long after he said this did the pause last? A: He—It seemed to me like he paused for about 20 seconds. He didn't say anything, and I told him—First I told him that *"Do you understand that once you say you want an attorney, you know, we have to stop talking."* It's going to be difficult to change and go back and forth. Q: What did he say to that? A: Said that he knew that. Q: Okay. A: Then he paused, and he—he seemed to have difficulty starting to talk, so I told him that what I was going to do, I'd go ahead and start typing the questions, and I would try to make them as easy as possible getting into this thing and that *if we arrived at a point where he didn't want to answer any questions, he didn't want to say anything more or he*

*wanted his attorney, to say so, and so he said, "Okay,"*
. . .
(Italics ours.) 2 Report of Proceedings, at 201–02.

The above quoted testimony indicates that Detective Dean's questioning was properly within the scope of the *Nash* rule. After Robtoy made his equivocal statement regarding an attorney, Detective Dean sought clarification of Robtoy's words. There was no further interrogation about any offense until Dean was satisfied Robtoy had no present desire to have the presence of an attorney. Further, Robtoy was reminded by Detective Dean that he would cease questioning immediately if Robtoy wanted to remain silent or speak with an attorney.

At that point, we believe the totality of the circumstances indicates that Robtoy made a voluntary, knowing, and intelligent waiver of his Fifth Amendment rights. *See Miranda v. Arizona,* 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). In light of the fact that Robtoy acknowledged his awareness that he could terminate questioning at any point, had several experiences of being informed of and actually exercising his *Miranda* rights, and apparently did not again request an attorney after a pause in questioning, we find that Robtoy's subsequent confessions to the murders of David King and Ruth Pitts were voluntarily given. The evidence was therefore properly ruled admissible.

## II
### "Other Crimes" Evidence

Robtoy next assigns error to the trial court's admission of evidence of prior criminal conduct, namely, the Ruth Pitts murder, for the limited purpose of showing premeditation and motive. The admissibility of evidence of prior criminal conduct is governed by ER 404(b):

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, iden-

tity, or absence of mistake or accident.

The official comment to ER 404(b) is instructive in the application of the evidentiary rule:

> The court must determine whether the danger of undue prejudice outweighs the probative value of the evidence, in view of the availability of other means of proof and other factors. Slough & Knightly, *Other Vices, Other Crimes*, 41 Iowa L. Rev. 325 (1956). Previous Washington law is in accord. *See State v. Whalon*, 1 Wn. App. 785, 464 P.2d 730 (1970).
>
> The fact that section (b) uses the discretionary word "may" does not confer arbitrary discretion on the trial judge. Whether evidence is admissible under this section is determined by reference to the considerations set forth in Rule 403.[2]

The law is well settled in the area of collateral crimes evidence that the other crime must be connected to the defendant, and proof must be by a preponderance of the evidence. *State v. Tharp*, 96 Wn.2d 591, 593–94, 637 P.2d 961 (1981). Before evidence of prior crimes, wrongs or acts can be admitted, two distinct criteria must be met. First, the evidence must be shown to be logically relevant to a material issue before the jury. We have previously expressed the test as "whether the evidence . . . is relevant and necessary to prove an essential ingredient of the crime charged." *State v. Goebel*, 40 Wn.2d 18, 21, 240 P.2d 251 (1952) (*Goebel II*); *State v. Dinges*, 48 Wn.2d 152, 154, 292 P.2d 361 (1956). Second, if the evidence is relevant its probative value must be shown to outweigh its potential for prejudice. *See State v. Goebel*, 36 Wn.2d 367, 379, 218 P.2d 300 (1950) (*Goebel I*). The trial court must exercise its discretion in weighing the probative value of the evidence against its prejudicial effect, and that decision will be disturbed only if the court abused its discretion. *Goebel II*, at

---

[2]ER 403 reads:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

24.

We turn first to consider the possible relevance of the Ruth Pitts murder to Robtoy's motive. Recently, we defined the word "motive" to mean "'[a]n inducement, or that which leads or tempts the mind to indulge [in] a criminal act.'" *Tharp*, at 597. It is difficult to ascertain how the Pitts murder could be a motive or inducement for Robtoy's killing of David King some 10 months later, especially in light of the State's proffered explanation of the connection. Initially, the prosecution argued that Robtoy murdered Ruth Pitts in order to steal property from her and likewise killed David King to steal property from him. Thereafter, the prosecution took the position that Robtoy killed David King "so he could follow through with his plans to escape from the prison system and get out of the State of Washington, and that's really all there is to it". 8 Report of Proceedings, at 2056. The theft motive in the Pitts homicide and the escape motive in the King homicide are so dissimilar in nature that we must determine there is no relevant connection. Even had the Pitts murder been logically relevant to the issue of motive, its probative value would be slight in comparison to the prejudicial effect of the evidence.

Next we must consider the possible relevance of the Ruth Pitts murder on the issue of premeditation. The trial court properly instructed the jury that "premeditation" involves the deliberate formation of and reflection upon the intent to take a human life. *See State v. Shirley*, 60 Wn.2d 277, 278, 373 P.2d 777 (1962); *State v. Tikka*, 8 Wn. App. 736, 740, 509 P.2d 101 (1973). Again, it is by no means clear how the earlier killing of Ruth Pitts by strangulation could show that Robtoy formed the reflective, deliberative state of mind preceding his killing of David King that would establish premeditation. No explanation of the logical relevance of the evidence to premeditation was offered by the prosecution other than to say the Pitts murder evidence would assist the jury in finding premeditation in this case. Moreover, the potential for prejudice is obvious because the jury

could well have interpreted the evidence of the prior killing as proof that Robtoy acted in conformity therewith on this occasion. ER 404(b) prohibits such evidence.

■ We believe error was committed in permitting the Ruth Pitts homicide evidence to be introduced in Robtoy's prosecution for the killing of David King. The evidence tended to prove neither motive nor premeditation as those issues related to the King murder. As was stated in *Goebel* I:

> [W]e are of the opinion that this class of evidence, where not essential to the establishment of the state's case, should not be admitted, even though falling within the generally recognized exceptions to the rule of exclusion, when the trial court is convinced that its effect would be to generate heat instead of diffusing light, or, as is said in one of the law review articles above referred to, where the minute peg of relevancy will be entirely obscured by the dirty linen hung upon it.

*Goebel* I, at 379. In other words, we believe that whatever relevance the Pitts murder had on the issues of motive and premeditation, if any, was far outweighed by the potentially prejudicial effect of the evidence.

This conclusion, however, does not end our inquiry. It remains to be determined whether the error in this case was prejudicial or harmless error. The erroneous admission of the Ruth Pitts homicide evidence is not of constitutional magnitude. Accordingly, the stringent standard of proving "'harmless error beyond a reasonable doubt'" is inapplicable. *State v. Cunningham,* 93 Wn.2d 823, 831, 613 P.2d 1139 (1980); *State v. Nist,* 77 Wn.2d 227, 461 P.2d 322 (1969). We apply instead the rule that error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected. *State v. Cunningham, supra; State v. Rogers,* 83 Wn.2d 553, 520 P.2d 159 (1974); *State v. Craig,* 82 Wn.2d 777, 514 P.2d 151 (1973).

We are convinced that exclusion of the Ruth Pitts homicide evidence would not have changed the outcome of this case. Indeed, the remaining untainted evidence, including

Robtoy's confession to the David King murder, can fairly be characterized as overwhelming.

## III
### WITHDRAWAL OF NOT GUILTY PLEA

Finally, Robtoy asks that he be permitted to withdraw the not guilty plea entered on his behalf so that he may now plead guilty to first degree murder and avoid the sentence of life imprisonment without possibility of parole. At his arraignment, Robtoy stood mute before the court and failed to enter a plea. Accordingly, the trial judge entered a plea of not guilty on his behalf. Robtoy then proceeded, consistent with the plea of not guilty, to vigorously defend the case on the merits. It is only after he was convicted, sentenced, and had his death sentence vacated by this court in *State v. Frampton*, 95 Wn.2d 469, 627 P.2d 922 (1981) that Robtoy first raised this issue to the trial court. The trial court refused to rule on Robtoy's motion without the permission of this court. We denied Robtoy's motion on September 25, 1981. The issue has been raised again on appeal.

We first note that there is no constitutional right to plead guilty to a criminal charge. *United States v. Jackson*, 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968). Beyond this, Robtoy can point to no case authority, statute, or court rule which gives him that right at this late date. The situation here is thus quite unlike the one in *State v. Martin*, 94 Wn.2d 1, 614 P.2d 164 (1980), where we found the right to plead guilty in CrR 4.2(a). A plea of not guilty maintains all of the rights of the defendant and places in issue all elements of the offense charged. *State v. Riley*, 63 Wn.2d 243, 244, 386 P.2d 628 (1963). Certainly, no defendant is entitled to gamble on submitting a case to a jury on the theory that he has entered a plea of not guilty and, then, after verdict, say that he was prejudiced by not having been given an opportunity to plead guilty. Since we find Robtoy's argument unpersuasive, his motion to withdraw the plea of not guilty entered on his behalf is denied.

In summary, we hold that the trial court did not err in admitting Robtoy's confession to the King murder, that the error in admitting the Ruth Pitts homicide evidence was harmless, and that Robtoy should not be permitted to withdraw the not guilty plea entered on his behalf. Since we have already held that Robtoy's death sentence is vacated, *State v. Frampton, supra,* we now hold that his conviction is in all other respects affirmed.

Affirmed.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, UTTER, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., concur.