FILED
COURT OF APPEALS
DIVISION II

2015 MAR 31 AM 8: 33

STATE OF WASHINGTON
BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44168-3-II |
| Respondent, | |
| v. | |
| TRAVIS C. BAZE, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — A jury found Travis Baze guilty of first degree assault, first degree robbery and first degree felony murder. Baze appeals, arguing that (1) the trial court improperly admitted the statement Baze made to the police and (2) his convictions for assault and robbery must be vacated because they violate double jeopardy. The trial court properly admitted Baze's statements and his convictions do not violate double jeopardy. We affirm.

## FACTS

On March 26, 2012, Baze drove Stephen Churchill to a park for an arranged drug deal with Shawn Morrow. When Morrow arrived, Churchill jumped out of the car and hit him in the head with a baseball bat. Morrow suffered severe head trauma and later died from his injuries.

Detective Jeffrey Rhoades was the primary detective assigned to the investigation of Morrow's murder. On March 27, Rhoades interviewed Baze and Churchill at Churchill's residence and arrested both of them. After being booked into jail, Baze gave a lengthy recorded interview to Rhoades and Detective Matt Ledford, in which Baze admitted his involvement in

Morrow's assault. Baze also told Rhoades that Churchill took $45 from Morrow. Baze stated that he thought Churchill was going to "maybe rough [Morrow] up and take his money," but he did not know Churchill was going to beat Morrow in the head with a bat. Ex. 70 at 22 (some capitalization omitted). After the assault, Churchill told Baze that he beat Morrow because Morrow had stolen from him.

The State charged Baze with first degree assault, first degree robbery, first degree felony murder (predicated on the robbery), and second degree felony murder (predicated on the assault) in the alternative to first degree felony murder. In addition, Baze was charged with a deadly weapon enhancement for each crime.

The trial court held a CrR 3.5 hearing to determine the admissibility of Baze's statement. Detective Rhoades testified that he read Baze his *Miranda* rights when Baze was arrested and told Baze that detectives would speak to him after he was booked into jail. Later, the detectives transported Baze from jail to an interview room in the sheriff's office. The State introduced the transcript of the recorded interview. The following exchange took place immediately after Baze consented to the interview being recorded:[1]

> DETECTIVE RHOADES: . . . And I know that we've done this once already . . . out at the house but since we're back on tape or since we are on tape I am gonna advise you of your rights. You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right at this time to talk to a lawyer and to have him present with you while you're being questioned. If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish. You can decide at anytime to exercise these rights, not answer any questions or make any statements. Do you understand those rights?
> BAZE: Yes.

---

[1] The ellipses in this extensive quote from the interview are only used where "uh" or "um" have been removed from the transcript. No substantive information has been removed for the period of time between when Baze was read his rights and when he waived them.

DETECTIVE RHOADES: . . . Want you to do me a favor sign right there for me please. . . . And all you're signing for here is that you've been advised of your rights and that you understand them. Kay?

BAZE: Okay.

DETECTIVE RHOADES: Travis having been advised of your rights do you wish to answer questions?

BAZE: Well . . . to be honest with you . . . like as of right now . . . I'm not sure can you tell me like I I've got no problem telling you guys what what went down.

DETECTIVE RHOADES: Okay.

BAZE: How it went down.

DETECTIVE RHOADES: Okay.

BAZE: And I've got I've got no problem being honest with you but did you am I do I need an attorney?

DETECTIVE RHOADES: That's up to you kay. You have the right to have an attorney here. And what I'll tell you is you know if you want an attorney by all means that's your right I've got no problems with that but we're not gonna be able to do a statement tonight.

BAZE: What does that mean for me?

DETECTIVE RHOADES: What that means for you is I can pretty much guarantee you with great certainty that an attorney's gonna tell you not to make any statements or not to say anything to the police. That's their blanket their blanket statement that's the advice they give everybody.

BAZE: Um, hm.

DETECTIVE RHOADES: But the dilemma that puts that puts you in or that puts us in is we've gotta go forward with this case then with the evidence that we already have and statements of the other people involved. So I mean it's up it's up to you right now if you want to tell your story in your own words kay we can do that or if you'd like to talk to an attorney by all means you have that right okay. But the issue is the court is gonna appoint you an attorney I don't I don't appoint an attorney I'm not gonna be able to appoint an attorney tonight, there's not gonna be an attorney who's gonna come down here and talk to you and then let you talk to us tonight. That's just that just doesn't happen okay. Like I said an attorney's gonna say you know don't say anything. But at that point you know it's a roll of the dice as far as you're concerned at that point.

BAZE: Um.

DETECTIVE RHOADES: I can tell you Travis the only thing that I'm interested in today is to get the truth. That's all we want.

BAZE: Okay well and I understand that . . . obviously that's your job.

DETECTIVE RHOADES: Sure.

BAZE: . . . From from my point of view my my . . . okay maybe maybe you see you know that's . . . that's what's . . . I guess my concern is obviously I don't want to be in jail.

DETECTIVE RHOADES: Sure. Let me tell you this regardless of whether you make a statement tonight or whether you don't make a statement tonight that's not gonna change okay, right now you're under arrest.

BAZE: Um, hm.

DETECTIVE RHOADES: You're under arrest until you see a judge.

BAZE: Okay.

DETECTIVE RHOADES: So whether or not you make a statement tonight is gonna have no bearing on whether or not you're in jail tonight okay. So if that's what's weighing on your mind regardless.

BAZE: So what so what am I what am I under arrest for?

DETECTIVE RHOADES: At this point it's assault. And we're not sure of the degree right now okay. It depends on the degree of Sean's injuries. And that's all it comes down to okay.

DETECTIVE LEDFORD: And maybe based on your statement and what you have to say may add to your involvement in this case or take away from your involvement but without your statement you put it in your own words we can't we can't nail it down as to what your involvement was so we gotta error on the side of caution as to you being maybe more involved than what you are. And that's just for safety reasons so that's kinda where we're at.

BAZE: Okay . . . I guess . . . so so how . . . if you if you believe that I didn't do it but I was there then then and I'm not trying to be a smartass with you or nothing I'm just why why am I being charged for assault if you believe that I wasn't there?

DETECTIVE RHOADES: Because.

BAZE: Or thought that I was there sorry.

DETECTIVE RHOADES: I believe that you were there and that you knew what was gonna happen before it happened. Okay.

BAZE: (Inaudible)

DETECTIVE RHOADES: And that's the crux of it. Okay. It's my belief that you and Stephan went there knowing what was gonna happen and knowing what he intended to do. And that once it was done you two left together and that you didn't contact the police and tell them what he did. Kay. That's kinda the bare bones that's what the law the way the law reads as far as your involvement. You're not the one that I don't believe you're the one that swung the bat but you were there when it happened, you didn't do anything to stop it. Kay and you didn't do anything to report it. Which is all I know right now okay. I believe if there's maybe some different circumstances that you're aware of that we're not or we'd love to hear them. Kay. And that's why we give everybody the chance to come in here and tell their side of the story. Cause nobody can tell your story like you can.

BAZE: You sure?

DETECTIVE LEDFORD: Well for all you know for all intensive purposes [sic] we give you the opportunity but you might want to say I want to say no Stephan didn't do that I did that and that's that's why we're letting you put this into your own words.

BAZE: I understand that . . . and I and that you know and I can't I didn't do that I . . . .

DETECTIVE LEDFORD: And that's why we're giving you the opportunity to give the statement and that's why we brought you over here somewhere where we just talk.

DETECTIVE RHOADES: We're not sitting in the jail where everybody looks through the fucking windows and everybody (inaudible) and can see you sitting down there talking to a couple of police okay.

BAZE: So . . . I just . . . I I'm un I'm unsure of what to what to do is what my problem is right now because I don't feel you know I what's . . . I don't I don't I I don't want to nark [sic] on anybody, I don't want to be a part of something that I'm not, and I don't want an assault charge on my record.

DETECTIVE LEDFORD: And we understand that I mean if if you need to take a few moments and gather your thoughts you know that's fine. But I don't we don't want to pressure you into anything all[,] all we want to do is just put the honest truth down as it truly happened and not put any words in anybody's mouth. (inaudible) who didn't do anything or did less than you know we don't want to make it look like somebody did more than something we just want to be honest and transparent and you know what happened happened we can't change it now, all we can do is try and explain it as accurately as possible.

DETECTIVE RHOADES: We're just trying to do the right thing. That's.

BAZE: I understand that . . . .

DETECTIVE RHOADES: And I'm not gonna sit here and pretend to say that I know how you feel cause I don't know how you feel. I don't know what it's like to be sitting where you're at but what I can tell you Travis is I've done this job a long time, he's done this job a long time, I've sat with many young men in your situation okay, and one thing I can say from experience is people will tend to feel better after they've told their story. Kay. Whether it's now, whether it's later they tend to feel better. Cause I can tell just now here by looking at ya I can tell when we were out there at the house kay this has been eating at ya. And it's not something that's easy to walk around and pretend like it didn't happen.

DETECTIVE LEDFORD: And you're concerned you're concerned for a couple of reasons, you know and that's clear you're you have a conscience you're a normal person. You're not some you know psychopath with no conscience.

BAZE: Okay I and that's true I I can agree with you there I do have a conscience and I do know I do have morals and I do . . . and I do care for for lots of different reasons but . . . but I but I and you know I I . . . I don't know I I don't I'm I got a lot through going through my mind right now. I don't I don't . . . .

DETECTIVE RHOADES: Well let's talk it out, what is it what's what's bothering you the most?

BAZE: What's bothering me the most is . . . that that I'm in custody.

DETECTIVE RHOADES: Kay.

BAZE: . . . That's bothering me a lot. It's bothering me that I don't know . . . what's what's next. It's bothering me that I don't know if I'm you know do I I .

. . it's bothering me that I that I I never laid a finger on anybody and I and I'm sitting here for someone else's shit. That's bothering me a lot right now. And you know I'm not . . . I'm not and I'm not sure what's next that's that's.

DETECTIVE RHOADES: What what do you mean what's next as far as what happens tonight, what happens tomorrow?

BAZE: Yeah sure sure yeah sure . . . .

DETECTIVE RHOADES: Well I'll tell ya what's gonna happen tonight alright. Tonight you're gonna be booked into jail . . . for assault. Tomorrow . . . probably tomorrow morning after nine o'clock you're gonna be taken over you've been through the court system before you've been arrested before.

BAZE: Sure.

DETECTIVE RHOADES: Okay so you know how that game goes. You're gonna be taken over there, you're gonna have an (inaudible) hearing the judge is gonna read a probable cause statement they're gonna determine whether or not based on that report whether there's probable cause to continue to hold you for the charge okay. At that point they'll review your status ie [sic] qualify for court appointed counsel or you make enough money that you're gonna have to hire your own attorney. So you will have a chance to meet with an attorney tomorrow regardless in the courtroom whether it's . . . the one that you continue continues with your [sic] throughout the process. Okay. So that's what's gonna happen in the immediate future that I know because that's what happens on every case.

BAZE: Okay.

DETECTIVE RHOADES: Alright. But what happens from there depends on you. I mean it depends on the other people and it depends on the evidence. Okay.

DETECTIVE LEDFORD: But a lot of times these cases depend on peoples [sic] involvement.

DETECTIVE RHODES: Um, hm.

DETECTIVE LEDFORD: And their honesty.

BAZE: Sure.

DETECTIVE LEDFORD: And you know a judge or prosecutor can see that. If somebody wants to be honest or whether they want to be dishonest. And a lot of times that that has a baring [sic] as to you know releasing somebody on bail or not releasing them on bail (inaudible) release them on recognizance you know that sort of thing.

DETECTIVE RHOADES: You know and I'll be honest with ya I've got some questions I've got some questions as far as your involvement and to what degree. Okay. There's some things like I said I feel fairly certain about that I can I can walk into a courtroom and I can prove right now. Alright. But it's the little intangibles that kinda the the why and the how much knowledge . . . prior to and as to whose idea those are the things that I have questions about. And those are the things that I I'm hoping you can answer for me.

BAZE: Okay . . . what . . . as far as what . . . what you guys know of my involvement what what . . . what degree am I what is that I mean what am I looking at what.

DETECTIVE RHOADES: I would love to sit and talk to you about that okay but we gotta make a decision here as to whether or not we're gonna sit and talk.

BAZE: (inaudible) Okay.

DETECTIVE RHOADES: Okay I I've got no problems sitting and telling you what I know. Alright. But we've come to the point of where we're gonna have you have to make a decision okay as far as how you want this to go and what you want to do. We can't make the decision for ya.

DETECTIVE LEDFORD: Travis (inaudible) trick ya or make you say anything that you don't want to say okay we're not here to put words in your mouth and that's what this opportunity is.

DETECTIVE LEDFORD: It's not TV we're not gonna have this great big Perry Mason moment where we back you into a corner and I jump up and down and scream scream calling you a liar and there's no ah ha. A case like this is very straight forward. Either something happened or it didn't happen.

BAZE: Okay well obviously it happened.

DETECTIVE RHOADES: Well yeah we know that okay we know that.

BAZE: . . . I feel like I feel like I . . . I feel I don't feel I've earned a charge out of this and I don't feel like like I should.

DETECTIVE RHOADES: Well and I'd love to hear ya explain that.

DETECTIVE LEDFORD: That's kinda what we gotta talk about with your consent though you know and we can have a two way conversation but we can't do that unless you want to. It's best you know it's kind of a it's kinda of a wall between us here at this point. Okay.

BAZE: . . . Okay. What what (inaudible).

DETECTIVE LEDFORD: Would you like to speak to us and continue this conversation?

BAZE: Sure.

DETECTIVE RHOADES: Kay.

DETECTIVE LEDFORD: Okay. (inaudible) initial here or sign here acknowledging that you wish to speak to us and we're gonna go ahead and continue this.

Ex. 2, at 2-11 (some capitalization omitted). Baze's written waiver of his *Miranda* rights was admitted at the CrR 3.5 hearing.

After the hearing, the trial court concluded that Baze's initial statement to the detectives was an equivocal request for counsel and that the detectives then limited the colloquy clarifying

7

whether Baze wished to waive his rights. And, the trial court also concluded that "[t]he fact that the defendant was told that there wouldn't be an attorney available to be appointed that night did not render the advisement of rights ineffective." Suppl. Clerk's Papers (SCP) at 176. The trial court further concluded that Baze made a "clear, voluntary, knowing, and intelligent" waiver of his right, and ruled Baze's statements were admissible.

A jury found Baze guilty of first degree assault, first degree robbery, first degree felony murder, and second degree felony murder. The jury also returned special verdicts finding that Baze or an accomplice was armed with a deadly weapon during the commission of all four crimes. The trial court vacated the verdict for second degree felony murder predicated on the assault and sentenced Baze to standard range sentences on the first degree assault, the first degree robbery, and first degree felony murder. Baze appeals.

## ANALYSIS

A.     ADMISSIBILITY OF STATEMENTS

Baze argues that the trial court erred by admitting his statements because (1) the detectives' statements after his equivocal request for an attorney violated his right to an attorney under *Miranda*[2] and (2) the detectives' statements after his equivocal request for an attorney made the waiver of his *Miranda* rights involuntary.[3] We hold that the trial court properly concluded that the

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] Baze also argues that the statements should be suppressed because the State violated CrR 3.1(c) by failing to take steps to immediately provide Baze with a way to contact an attorney. Baze never argued that the State violated CrR 3.1(c) at the trial court and is not permitted to raise the issue for the first time on appeal. RAP 2.5(a). RAP 2.5(a)(3) allows an appellant to raise a manifest error affecting a constitutional right for the first time on appeal. Under RAP 2.5(a)(3) the error must be truly of constitutional dimension. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). CrR 3.1 is not a rule of constitutional dimension. *State v. Guzman-Cueller*, 47 Wn. App. 326, 334,

detectives' comments did not violate his right to an attorney under *Miranda* and that Baze's statements were voluntary. Therefore, we affirm.

We review the trial court's findings of fact from a CrR 3.5 hearing to determine if they are supported by substantial evidence. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). We review conclusions of law de novo to determine whether they are properly derived from the findings of fact. *State v. Pierce*, 169 Wn. App. 533, 544, 280 P.3d 1158 (citing *State v. Grogan*, 147 Wn. App. 511, 516, 195 P.3d 1017 (2008)), *review denied*, 175 Wn.2d 1025 (2012). Unchallenged findings of fact are considered verities on appeal. *Id.* Here, there were no disputed facts.[4]

1.   Request for Counsel

Baze asserts that his statement "[d]o I need an attorney?" was an equivocal request for counsel and limited the officers' questioning to whether the defendant would like an attorney. Baze argues that his statements should have been suppressed because the officers did not limit their questioning to whether he wanted an attorney. We disagree.

Our Supreme Court articulated the rule for which Baze advocates in *State v. Robtoy*, 98 Wn.2d 30, 39-40, 653 P.2d 284 (1982). In *Robtoy*, our Supreme Court held:

> "[W]henever even an equivocal request for an attorney is made by a suspect during custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified."

---

734 P.2d 966 (1987). Therefore, Baze's claim that the detectives violated CrR 3.1 is not an error affecting a constitutional right and may not be raised for the first time on appeal.

[4] Baze assigns error to two of the trial court's findings of fact, but only in so far as they should be considered legal conclusions.

*Id.* at 39 (quoting *Thompson v. Wainwright*, 601 F.2d 768, 771 (5th Cir. 1979)) (alteration in original).

But, in 1994, the Supreme Court of the United States decided *Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). In *Davis*, the Court determined that if a defendant makes an equivocal request for counsel the police may continue questioning unless or until the defendant explicitly and unequivocally requests an attorney. *Id.* at 461. In 2008, our Supreme Court explicitly stated that *Davis* was the law under the Fifth Amendment and, thus, it was the law when applying the Fifth Amendment and *Miranda* in Washington. *State v. Radcliffe*, 164 Wn.2d 900, 906-07, 194 P.3d 250 (2008).

Baze argues that we should return to applying *Robtoy* because article 1, section 9 of the Washington Constitution provides broader protection than the Fifth Amendment. However, we need not determine whether the Washington Constitution requires a return to the *Robtoy* rule because under the facts of this case, the result would be the same regardless of whether we apply *Robtoy* or *Radcliffe*. *See City of Seattle v. Williams*, 128 Wn.2d 341, 347, 908 P.2d 359 (1995) (There is a "well-established policy that if, in order to resolve an issue before us, it is not necessary to reach a constitutional question, an appellate court should decline to do so."). Therefore, we proceed assuming, not deciding, that the *Robtoy* rule applies.

In *Robtoy*, the suspect stated that "maybe" he wanted a lawyer. 98 Wn.2d at 40. The officers told the suspect that, if he asked for an attorney, the "conversation ends right here." *Id.* The suspect paused, and the officer told him "[d]o you understand that once you say you want an attorney, you know, we have to stop talking. It's going to be difficult to change and go back and forth." *Id.* The suspect continued to pause and seemed "to have difficulty starting to talk" so the

officer told him he was going to start writing out questions and if the suspect wanted to stop answering questions or to speak to an attorney he should let the officer know. *Id.* at 40-41. The suspect assented. *Id.* at 41.

The court determined that "[a]ny questioning after the equivocal assertion of the right to counsel must be strictly confined to clarifying the suspect's request." *Id.* at 39. Under this rule, the court held that the officer's questions were properly limited to clarifying the suspect's equivocal request and whether the suspect wanted to continue speaking to the police. Specifically, the court explained:

> After Robtoy made his equivocal statement regarding an attorney, Detective Dean sought clarification of Robtoy's words. There was no further interrogation about any offense until Dean was satisfied Robtoy had no present desire to have the presence of an attorney. Further, Robtoy was reminded by Detective Dean that he would cease questioning immediately if Robtoy wanted to remain silent or speak with an attorney.

*Id.* at 41.

Here, the detectives complied with the requirements of *Robtoy*. When Baze asked if he needed an attorney, the detectives told him that he had to be the one to make that decision. In fact, the detectives reminded him multiple times that he could decide to have an attorney if he wished and it was his decision to make. And, the detectives were clear that if Baze wished to have an attorney, they would stop questioning him.

Moreover, during the course of the exchange, the detectives did not "question" or "interrogate" Baze. Rather, they answered his questions when he was attempting to clarify the current situation. There was no substantive discussion until Baze affirmatively told them he would continue speaking with them and signed the waiver of his rights. Prior to Baze signing the waiver, the detectives stopped him from making substantive statements and reminded him that "[t]hat's

11

kinda what we gotta talk about with your consent though you know and we can have a two way conversation but we can't do that unless you want to. It's best you know it's kind of a it's kinda of a wall between us here at this point." Ex. 2 at 11. Because the detectives did not continue questioning Baze or take a statement regarding the assault until after Baze affirmatively waived his rights, the detectives complied with the more restrictive rule articulated in *Robtoy*.[5]

Therefore, as far as the effect of Baze's equivocal request, Baze's statements would be admissible under either the *Radcliffe* rule, which does not restrict the scope of the detectives' questioning after an equivocal request for counsel, or the *Robtoy* rule, which restricts the scope of the detectives' questioning to clarifying the equivocal request. The trial court did not err in admitting Baze's statements.

2. Voluntariness of Statements

Baze also argues that his waiver of his right to an attorney was involuntary because the detectives contradicted the *Miranda* warnings and improperly urged him to give a statement without an attorney present. We disagree.

We examine the totality of the circumstances "'to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.'" *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008) (quoting *Fare v. Michael C.*, 442 U.S. 707, 724-25, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)). Because coercive police

---

[5] To the extent that Baze argues that the detectives' statements violated *Robtoy* because they misrepresented the availability of an attorney and undermined the role of having an attorney present, he is incorrect. *Robtoy* is concerned with the overall content of the exchange—whether the questioning is limited to clarifying the request for an attorney. Whether the detectives' statements were improper or misleading goes to whether the detectives' statements rendered Baze's waiver involuntary. It has no bearing on whether the restrictions in *Robtoy* were violated.

activity is necessary to render a confession involuntary, "both the conduct of law enforcement officers in exerting pressure on the defendant to confess and the defendant's ability to resist the pressure are important." *Id.* at 101. To determine whether the totality of the circumstances renders a confession involuntary we consider:

> [T]he "crucial element of police coercion;" the length of the interrogation; its location; its continuity; the defendant's maturity, education, physical condition, and mental health; and whether the police advised the defendant of the rights to remain silent and to have counsel present during custodial interrogation.

*Id.* (quoting *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993). The ultimate question is "'whether [the interrogating officer's] statements were so manipulative or coercive that they deprived [the suspect] of his ability to make an unconstrained, autonomous decision to confess.'" *Id.* at 102 (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir.), *cert. denied*, 479 U.S. 989 (1986)). A statement is voluntary "'so long as that decision is a product of the suspect's own balancing of competing considerations.'" *Id.* (quoting *Miller*, 796 F.2d at 605).

As an initial matter, the overall context of the interview does not support the conclusion that Baze's waiver of his rights was involuntary. The time between Baze asking, "Do I need an attorney?" and making the decision to waive his rights is approximately 15 minutes. There are no indications or factual findings that would raise concerns based on Baze's maturity, education, or health. And, Baze was not only advised of his rights twice, but he signed a document affirmatively stating that he understood his rights. Therefore, the ultimate question is whether the detectives' statements were so manipulative or coercive as to overcome Baze's ability to make an "unconstrained, autonomous decision" regarding whether to waive his rights and give a statement to the police. *Id.*

No. 44168-3-II

Baze cites to very specific statements that the detectives made to argue that his confession was involuntary. But we do not look at particular statements in isolation. *Id.* at 105. Because we look at the totality of the circumstances, we must look at the detectives' statements within the context of the conversation as a whole and then determine whether the detectives' conduct was so coercive as to render Baze's decision to give a statement involuntary. Here, the totality of the circumstances does not support the conclusion that the statement was involuntary because (1) Baze affirmatively engaged with the detectives by repeatedly asking the detectives questions, (2) the detectives continued to tell Baze that it was his decision regarding whether to waive his rights, and (3) Baze's fundamental concern was having to remain in jail and the detectives were clear that Baze was going to remain in jail regardless of whether he gave a statement.

Baze claims that the detectives overcame his will to make an autonomous decision because they misrepresented the availability and desirability of an attorney. Baze appears to base his argument on a misunderstanding of the case law regarding what constitutes an improper misrepresentation of the availability of an attorney. He relies on *State v. Tetzlaff*, 75 Wn.2d 649, 453 P.2d 638 (1969), but *Tetzlaff* does not support his assertion that the detectives' explanation regarding when an attorney would be appointed rendered his statement involuntary. In *Tetzlaff*, the suspect was informed that, if he was indigent, an attorney would be appointed by the court *if he was charged.* 75 Wn.2d at 650. Our Supreme Court held that the warnings were insufficient because they informed the suspect that his right to an attorney was predicated on being charged with a crime. *Tetzlaff*, 75 Wn. App. at 652.

Later, Division Three of this court distinguished the holding in *Tetzlaff*. In *State v. Teller*, the defendant claimed that the warnings read to her were insufficient because they informed her

14

that she had the right to have an attorney appointed by the court. 72 Wn. App. 49, 51, 863 P.2d 590 (1993), *review denied*, 123 Wn.2d 1029 (1994). Prior to questioning, the suspect was informed that she was "entitled to have [an attorney] appointed for you by the court without cost to you and to have him or her present before or during questioning or the making of any statement." *Teller*, 72 Wn. App. at 51. The court noted that the flaw in the warning provided in *Tetzlaff* was not that the warnings stated that the attorney would be appointed by the court, but rather that, the warning advised the suspect that the right to an attorney was conditioned on being charged. *Id.* at 53.

Here, the detectives did not make an improper representation regarding the availability of an attorney. The warnings that were read to Baze properly informed Baze that he had the right to an attorney before or during any statement. Baze was reminded multiple times that he had the right to request an attorney. The detectives were clear that the right to an attorney had attached and Baze could assert that right if he wished. Unlike *Tetzlaff*, the detectives never misled Baze into believing that the right to have an attorney present was conditioned on some future event. Rather, like *Teller*, Baze was properly informed that he could have an attorney present with him before and during questioning. The detectives did not improperly mislead Baze about his rights to have an attorney present.

Baze also argues that the detectives misrepresented the desirability of requesting a lawyer by telling Baze that a lawyer would tell him not to make a statement that night. Although ill-advised, the statement was not coercive. When Rhoades made the statement he was speaking from his own experience, he was not giving Baze legal advice. And, there were no direct adverse consequences that would result from Baze's decision to request an attorney. The detectives were clear that Baze was going to stay in jail overnight regardless of whether he gave a statement. The

15

detectives did not make any promises or threats based on whether Baze gave a statement that night. Because nothing was conditioned on Baze making a statement that night, the detectives' statement could not be considered so coercive it would override Baze's ability to make an autonomous decision about whether to waive his rights and give a statement.

Moreover, the detectives told Baze that they already determined that he was involved in the assault. They noted that sometimes judges and prosecutors took a suspect's honesty under consideration when setting bail, but they did not promise that Baze would get bail or reduced charges if he made a statement. The detectives told Baze the only benefit of making a statement would be getting the story in his own words and making him feel better. Detectives are permitted to use "psychological ploys such as playing on the suspect's sympathies, saying that honesty is the best policy for a person hoping for leniency, or telling a suspect that he could help himself by cooperating" without rendering a waiver of rights involuntary. *Unga*, 165 Wn.2d at 102 (citing *Miller*, 796 F.2d at 605).

Looking at the interview as a whole, the detectives may have engaged in some psychological ploys, but they did not engage in coercion. Because police coercion is necessary to render a statement involuntary, the trial court did not err in concluding that Baze's statement was voluntary and admissible. *Id.* at 100-01 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986)).

B.    MERGER/DOUBLE JEOPARDY

Baze argues that we must vacate both his first degree assault and first degree robbery convictions because they violate double jeopardy. Baze appears to argue that the first degree assault conviction violates double jeopardy because it merges with the first degree robbery. He

16

also argues that his first degree robbery conviction violates double jeopardy because it merges with the first degree felony murder conviction. Both arguments fail, and we affirm his convictions.

The double jeopardy clauses of the United States and Washington Constitutions prohibit multiple punishments for the same offense. *See e.g. State v. Adel*, 136 Wn.2d 629, 632, 965 P.2d 1072 (1998). The merger doctrine is a tool of statutory construction used to determine whether the legislature intended multiple punishments to apply to particular offenses. *State v. Saunders*, 120 Wn. App. 800, 820, 86 P.3d 232 (2004). Whether the merger doctrine implicates double jeopardy is a question of law, which we review de novo. *State v. Williams*, 131 Wn. App. 488, 498, 128 P.3d 98 (2006).

Baze's claim that convictions for first degree assault and first degree robbery violate double jeopardy has already been rejected by our Supreme Court. *State v. Freeman*, 153 Wn.2d 765, 778, 780-81, 108 P.3d 753 (2005) (holding that the legislature intended to punish first degree assault and first degree robbery separately, thus, convictions for both first degree assault and first degree robbery do not violate double jeopardy). Therefore, Baze's first degree assault conviction is affirmed.

Baze also argues that his first degree robbery conviction merges with the first degree felony murder conviction. Baze relies on *In re Personal Restraint of Francis*, 170 Wn.2d 517, 242 P.3d 866 (2010), and claims that *Francis* is dispositive. Baze is incorrect.

Baze relies on one sentence in *Francis*, "The killing 'had no purpose outside of accomplishing the robbery' and therefore the attempted robbery would merge into the felony murder." 170 Wn.2d at 527 (quoting *Williams*, 131 Wn. App. at 499). But both *Francis* and the case to which it cites, *Williams*, involved the merger of *attempted* robbery and felony murder.

Here, Baze was convicted of a completed first degree robbery and felony murder. Accordingly, cases addressing double jeopardy in the context of completed robbery and felony murder, such as *Saunders*, 120 Wn. App. 800, are applicable, not cases addressing attempted robbery and felony murder.

In *Saunders*, the defendants raped and killed the victim. They also took her watch. *Id.* at 806-08. A jury found the defendant guilty of felony murder, first degree rape, first degree robbery, and first degree kidnapping. *Id.* at 808. The defendant argued that his robbery conviction should merge with the felony murder conviction. *Id.* at 820. *Saunders* noted that a previous case had declined to merge a robbery conviction with a felony murder conviction because the robbery was separate and distinct from the murder. *Id.* at 822 (citing *State v. Peyton*, 29 Wn. App. 701, 720, 630 P.2d 1362 (1981)). Then the court in *Saunders* stated:

> Here, although the robbery and murder may have occurred close in time and place, the other [*State v. Johnson*, 92 Wn.2d 671, 600 P.2d 202 (1979)] factors indicate that merger of these two offenses is unwarranted. The record shows that [the defendants] committed the robbery after the murder and that they did not commit the robbery to facilitate the murder. Further, [the victim] sustained an independent injury from the robbery, the theft of her watch. Thus, the robbery was separate and distinct from the murder.

*Id.* at 822-23.

Following the reasoning of *Saunders*, Baze's robbery and murder convictions are also separate and distinct. First, the robbery and the murder had independent purposes. Churchill hit Morrow as revenge for Morrow stealing from him. The purpose of the robbery was to take Morrow's money. Second, the robbery resulted in an injury independent from the hit on the head that lead to Morrow's death—Churchill took the $45 Morrow was carrying. Accordingly, the robbery and felony murder convictions are separate and do not merge.

18

No. 44168-3-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Johanson, C.J.

_____
Maxa, J.